**UNITED STATES of America,**
**Plaintiff,**

v.

**Leonard W. HARE; Donald P. Fox; and Christopher W. Edwards, Defendants.**

**No. 4:03CR3006.**

United States District Court, D. Nebraska.

March 29, 2004.

960

Lynnett M. Wagner, Assistant United States Attorney, Lincoln, NE, for Plaintiff.

Scott A. Calkins, Byam, Hoarty Law Firm, Omaha, NE, John C. Vanderslice, Assistant Federal Public Defender, Lincoln, NE, Arthur R. Langvardt, Langvardt, Valle Law Firm, Hastings, NE, for Defense.

## MEMORANDUM AND ORDER

KOPF, District Judge.

The defendants, having been found in a vehicle with 100 kilos or more of marijuana, attack the character of the state trooper, Robert Pelster, who stopped their vehicle and found the drugs. Magistrate Judge Piester and I had previously ruled, after a full evidentiary hearing, that the stop and subsequent search and arrest (some of which was preserved on video tape) fully complied with the Fourth Amendment. The defendants, through their most able and inventive counsel, have now filed additional motions attempting to get the case thrown out or the evidence suppressed on other grounds.

Summarized and condensed, the defendants now claim that Pelster, a white man, unlawfully stopped them because they are black, and because they were driving a car with California license plates. Thus, they claim that their right to equal protection of the laws, under the Fourteenth Amendment,[1] and their right to travel, under the First Amendment, were violated. As a consequence, the defendants have moved to dismiss the case or suppress the evidence.[2]

---

1. I presume that the defendants also rely upon notions of equal protection implicit in the Fifth Amendment to the extent that the defendants seek relief against the federal government for the actions of the state trooper.

2. As Judge Piester notes (filing 241, at 67–68

Judge Piester granted the defendants wide-ranging discovery of records maintained by the Nebraska State Patrol. I later found that much of the discovery had been obtained improperly through ex parte applications for subpoenas duces tecum.[3] *United States v. Fox,* 275 F.Supp.2d 1006 (D.Neb.2003) (Federal Rule of Criminal Procedure 17(c) does not ordinarily permit the use of ex parte applications by the government or the defense for subpoenas seeking pretrial production of documents unless the sole purpose of seeking the documents is for use at trial; in other words, ex parte applications should not ordinarily be used when the purpose of the document production is to engage in pretrial litigation) (collecting cases). Nevertheless, by then "the cat was out of the bag," and, as Judge Piester's evidentiary hearing was drawing near, I permitted additional discovery to proceed, albeit subject to a protective order. *United States v. Fox,* 276 F.Supp.2d 996 (D.Neb.2003) (after hearing both parties, granting the defendants additional discovery based upon a document that had been improperly obtained by a prior ex parte application for a subpoena duces tecum). As a result, the defendants were provided with most of the documents they sought.

After a long evidentiary hearing, generating more than 1000 pages of transcript, and in an exceedingly thoughtful 69–page report and recommendation, Judge Piester advises me to deny the defendants' motions. The defendants have filed objections to that report and recommendation.[4] Although essentially protective, the government has also filed an objection.

After careful consideration, and de novo review, I agree with, and will adopt, Judge Piester's ultimate findings of fact, conclusions of law, and recommendations,[5] and I will deny the defendants' objections. I also decide that the defendants failed to make a timely preliminary showing that their claims had merit. Hence, while my additional decision does not change the result, but rather buttresses Judge Piester's ruling, I will grant a portion of the government's objection. Judge Piester need not have proceeded to hold an extensive evidentiary hearing or grant the defendants "discovery." Instead, he should have recommended dismissal of the motions.

I will therefore deny the defendants' motions. Because an enormous amount of time and effort has already been invested in this relatively simple case, and Judge Piester has done a superb job of resolving the motions, my remarks will be brief.

n. 43), even if the trooper violated the defendants' rights as alleged, there is little or no federal authority for imposing the remedy of dismissal or suppression. Without precedent from the Supreme Court or the Eighth Circuit supporting such a result, I probably would not dismiss this federal criminal case or suppress the evidence even if the state trooper violated the defendants' equal protection and travel rights. Like Judge Piester, I do not reach this question, although it is an issue which cries out for resolution by the appellate courts. As a practical matter, the federal trial courts need an answer in order to know whether the discovery and lengthy evidentiary hearings conducted in this case are ever necessary.

**3.** In fairness to both Judge Piester and defense counsel, they were following the past practice customarily used in this district. That is, in the past, Rule 17(c) applications were considered ex parte even if they were for the production of documents for use in pretrial litigation.

**4.** The government has filed a motion for enlargement of time to respond to the defendants' objections (filing 252), which will be denied.

**5.** I do not necessarily adopt all of Judge Piester's reasoning or language.

### I. The Government's Objection

■ The government mainly argues that while Judge Piester was ultimately correct in his ruling, he should never have allowed the defendants to engage in the broad discovery they were granted. Rather, the government argues that once the motions were filed, and before any discovery at all was allowed, Judge Piester should have decided whether the defendants had made the showing required by *United States v. Armstrong*, 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (in a case of alleged selective prosecution, in order to prevail on the merits the defendant must demonstrate that the action had a discriminatory effect and was motivated by a discriminatory purpose; in order to establish an entitlement to discovery in such a case, the defendant must first produce credible evidence that similarly situated defendants of other races could have been prosecuted but were not; evidence that every one of the 24 crack cocaine possession or conspiracy cases prosecuted in one court involved black defendants was not sufficient to warrant discovery). The government goes on to argue that had Judge Piester made this analysis, he would have found that the defendants had failed to make the required preliminary showing, and, accordingly, that the extensive discovery and the equally extended evidentiary hearing that followed were both unnecessary and improper. According to the government, Judge Piester should have simply recommended denial of the motions without further action. I agree with the government.

Despite the fact that *Armstrong* involves a selective prosecution case, the Eighth Circuit has applied *Armstrong* in selective enforcement cases like this one. *See United States v. Bell*, 86 F.3d 820, 822–23 (8th Cir.1996) (applying *Armstrong* in a criminal case where a black defendant claimed selective enforcement of Iowa's bicycle headlamp law; finding that even though all the arrests in this area were of black people, the defendant failed to show both that the enforcement had a discriminatory effect and that the enforcement was motivated by a discriminatory purpose). *See also Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir.2003) (in a civil case where a black driver alleged that she was stopped by a white deputy sheriff for reasons of race instead of crossing the center line of the highway as claimed by the deputy, the court applied *Armstrong* and reversed the district court's failure to grant summary judgment for the defendant; Chief Judge Loken wrote: "When the claim is selective enforcement of the traffic laws or a racially-motivated arrest, the plaintiff must normally prove that similarly situated individuals were not stopped or arrested in order to show the requisite discriminatory effect and purpose.") Other courts have applied *Armstrong* to selective enforcement situations and have held that no discovery should be permitted unless the defendant can make a threshold showing that both the "effect" and "intent" prongs of *Armstrong* might reasonably be said to exist. *See, e.g., United States v. Barlow*, 310 F.3d 1007, 1012 (7th Cir.2002) (in a criminal case involving a black defendant who was arrested in a train station and charged with a federal drug crime, the Seventh Circuit held it was proper to deny discovery where, despite a weak statistical study showing that only blacks were intercepted at the train station, the defendant was unable to make a threshold showing, based upon reliable information, to meet both prongs of *Armstrong;* the court said: "Without evidence of both discriminatory effect and discriminatory intent on the agents' part, [the defendant] could not make the threshold showing required in *Armstrong;* the district court therefore did not abuse its discretion in denying [the defendant's] motion for discovery."), *cert.*

*denied,* 538 U.S. 1066, 123 S.Ct. 2236, 155 L.Ed.2d 1123 (2003); *United States v. Alcaraz–Arellano,* 302 F.Supp.2d 1217 (D.Kan.2004) (in a drug case involving a Hispanic defendant who was seeking discovery relating to his claim that he was stopped in his auto as a result of racial profiling the court held, pursuant to *Armstrong,* that the defendant had the preliminary burden to present evidence tending to show both disparate effect and discriminatory intent in order to obtain discovery; despite the fact that the record showed the deputy stopped more Hispanics than other officers in the sheriff's department, this evidence was insufficient to entitle the defendant to discovery). In short, *Armstrong* should have been initially applied by Judge Piester before he authorized the wide-ranging discovery permitted in this case.

█ By the time the defendants filed their selective enforcement motions, Judge Piester had heard the evidence on the motions to suppress regarding alleged Fourth Amendment violations. Nothing in that evidence or in the new motions or in the briefs in support of the new motions showed anything remotely probative of the assertion that Trooper Pelster's actions had both a discriminatory effect and were motivated by a discriminatory purpose.

Indeed, the only evidence the defendants relied upon related to the fact that in this case Pelster called for a drug dog, and the fact that in the majority of the 12 or 13 other cases where Pelster called for that same dog ("Duke"), the traffic offenders were members of a minority group.[6] Such evidence is plainly insufficient. Although other explanations could be provided, four reasons illustrate this insufficiency.

First, given the strong evidence [7] that had already been presented to Judge Piester at the time the defendants filed their new motions,[8] which evidence clearly established that Pelster's actions in stopping, searching, and arresting these defendants were objectively justified under the Fourth Amendment, the defendants' extremely weak and indirect statistical evidence of discriminatory enforcement should have been rejected both as to the "effect" and "intent" prongs of *Armstrong.* Second, for purposes of selective enforcement in the context of stops, searches, and arrests, the pertinent inquiry is not into Pelster's use of a dog. Rather, the most particularly relevant question, dog or not (and "Duke" or not), is whether white people whom Pelster observed violating traffic or drug laws were not stopped, searched, or arrested. *Johnson,* 326 F.3d at 1000. The use or non-use of a drug dog proves nothing pertinent to the question of whether white members of the proper universe (whites and blacks eligible for stopping, searching, and arresting along the stretch of I–80 patrolled by the trooper) were ignored by Pelster. Third, assuming use

---

**6.** Apparently, the defendants first learned of this statistic during the evidentiary hearing on the Fourth Amendment motions. (Filing 52, at 2 (Fox's brief in support of motion to suppress based upon racial profiling).)

**7.** For example, that evidence included a video tape, which also made an audio recording, of the traffic stop. (Filing 73, at 3 (Report and Recommendation on Fourth Amendment motions) referring to Exhibit 4.) Pelster started the tape shortly before he stopped the defendants' car. On the tape, as Pelster stands by

the passenger side of the car, one of the defendants, Fox, who was in the passenger seat, can be heard essentially agreeing with Pelster that the driver, Hare, passed too close. Fox told Pelster, "I hold him [Hare] that."

**8.** The Fourth Amendment motions were filed on or about March 12, 2003. (E.g., filing 22.) The hearing on these motions was held on April 1, 2003 (filing 37) and April 21, 2003 (filing 45). The defendants filed their selective enforcement motions on or after May 1, 2003. (E.g., filing 49.)

of a drug dog might somehow be marginally relevant in the abstract to the alleged illegality of a stop, search, or arrest, the number of black traffic offenders who were subjected to Pelster's use of a dog is so small as to be meaningless. Fourth, since the "dog-use" statistic fails to compare Pelster's use of a dog with other *similarly situated* troopers' use of dogs, even if the numbers were larger, the statistic would still be irrelevant.

In summary, before any discovery or lengthy evidentiary hearings, Judge Piester should have applied *Armstrong* and recommended denial of the motions. Under *Armstrong*, the defendants could not make the required preliminary showing in order to entitle them to discovery. Therefore, they obviously could not demonstrate that Pelster's actions had a discriminatory effect and were motivated by a discriminatory purpose, as also required by *Armstrong*. Consequently, in addition to the reasons articulated by Judge Piester in his report and recommendation, the motions to suppress or dismiss will be denied because the defendants failed to comply with the dictates of *Armstrong* when they filed their motions.[9]

## II. The Defendants' Objections

Greatly condensed, Judge Piester ruled that the defendants failed to prove that the stop, the search, the use of the dog, or the arrests were motivated by race or had a discriminatory effect. (Filing 241, at 63.) The judge also decided that the defendants' rented vehicle was not stopped because it had California license plates, and he ruled that Trooper Pelster's practices did not burden the defendants' travel rights or the right of California motorists to travel in Nebraska. (Filing 241, at 67.)

The defendants object to Judge Piester's careful opinion for a wide variety of reasons. After de novo review, I have considered, and I have rejected, all of those arguments. However, a few of them merit slight additional responses, and I make those next.

### A.

The defendants argue that Judge Piester made various errors in assessing the credibility of the witnesses. With nearly 25 years on the job as a magistrate judge, Judge Piester's credibility assessments are founded upon a vast store of experience. That said, nothing in the record comes close to establishing that Judge Piester's credibility determinations were erroneous.

### B.

The defendants argue that Pelster testified that he would sometimes "de-police" and that proved he was race conscious. Pelster had been trained not to engage in racial profiling, as that practice is illegal. He had also been trained that race is never an indicator of criminal activity. In fact, the Nebraska Legislature had passed a law in 2001[10] requiring the Nebraska State Patrol to collect racial and ethnic data for those persons stopped by the Patrol in the hopes of determining whether racial profiling existed in Nebraska, and in the hopes of deterring the use of such a practice if it did exist. Thus, Pelster, like all the other troopers, knew that race and ethnic data were being collected

---

9. This means that magistrate judges in my cases should never allow discovery or hold extensive evidentiary hearings on these types of motions without requiring the necessary *Armstrong* showing. As this case illustrates (for example, note the Nebraska Attorney General's oral motion to quash (filing 151)), this type of broad ranging discovery of law enforcement agencies is very disruptive of important governmental functions and should be the extremely rare exception.

10. Neb.Rev.Stat. Ann. §§ 20–501 to 20–505 (Lexis Cum.Supp.2003), effective September 1, 2001.

to monitor his compliance with the ban on racial profiling. Indeed, Pelster testified that he was so concerned with the issue of racial discrimination that he would sometimes intentionally refrain from stopping minority motorists who had committed traffic violations in an attempt to avoid being perceived as a racist. Pelster called this practice, which was not approved by the State Patrol, as "de-policing."

While this testimony may prove that Pelster was unsophisticated, and quite frightened about being called a racist, it certainly does not have any tendency to prove that he stopped, searched, or arrested the defendants, or anyone else, because of their race or ethnicity. If it proves anything, it proves the opposite of the inference suggested by the defendants. This is particularly true where, as here, the evidence showed that the officer acted professionally when dealing with members of the minority public. (E.g., filing 241, at 35–36) (detailing the complaints of a black man who had been stopped by Pelster about 7 months before the defendants; while the witness did not believe he had violated the traffic laws, "[h]e described Trooper Pelster's demeanor as polite and unoffensive during the entirety of the traffic stop.")

### C.

■ The defendants complain that Judge Piester was not persuaded by their statistics. For example, they point out that in Troop C (the Grand Island area) 70 percent of the time Pelster stopped whites and 30 percent of the time he stopped minority group members. In contrast, the overall rate for Troop C indicated that 91 percent of the time whites were stopped. The defendants then add that in Troop A

(the Omaha area), and for all troopers, 88 percent of the stops were of white drivers and 12 percent were of minority drivers. Judge Piester was not moved by these and other numbers, and neither am I.

Pelster spent nearly 100 percent of his time on Interstate 80 in an area well-known for its high drug transportation volume,[11] and he was personally focused on drug interdiction. Indeed, his supervisors characterized his work in this region as "exceptional" with respect to drug enforcement. (Filing 241, at 18.) In fact, Pelster made ten cases in six months resulting in the seizure of significant quantities of drugs. Therefore, without a comparison of troopers whose work, focus, area, and time of patrol were similar to Pelster's, the defendants much more general statistics for troop (geographic) areas, rather than similarly situated troopers, prove almost nothing. See, e.g., Alcaraz–Arellano, 302 F.Supp.2d at 1231–32 (in a case involving a criminal prosecution for drugs arising out of a vehicle stop on I–70, the court was not persuaded by the fact that 57% of the time when the deputy sheriff arrested someone for drug charges, stemming from vehicle stops on I–70, those persons were Hispanics, while other deputies had lesser percentages; the court reasoned that the statistic was not meaningful because the subject deputy patrolled I–70 almost exclusively and the others did not).

### D.

■ The defendants argue that a showing of selective enforcement under *Armstrong* may be impossible and, therefore, *Armstrong* should not be applied. Rhetorically, they ask: How can we prove a negative, that is, how can we prove that

---

**11.** Recognizing that this court has the seventh heaviest criminal caseload in the nation, and that this caseload is driven largely by drug cases, I note that a significant number of this court's drug cases come from the Grand Island area and involve both drug interdiction cases on I–80 and drug distribution more generally.

Pelster did not stop, search, or arrest whites? Their concern has been raised by Judge Piester (filing 241, at 59 n. 40) and other thoughtful people.[12] However, I reject defendants' "impossibility" argument.

First, while the required showing is quite difficult, the complaint of "impossibility" is an overstatement. Initially, it is not my job to detail how these claims could be proven. But, as a general matter, and as an example for cases involving interstate highways and one officer, the defendants might be able to prove their discrimination defense with a mix of (1) focused statistics, comparing similarly situated law enforcement officers (having the same general duties, patrolling the same highway during the same time, and focusing on the same type of law enforcement activity) with the subject officer, showing a statistically significant and unexplained disproportion of stops, searches, or arrests of whites and blacks as between the subject officer and the other similarly situated officers; and (2) evidence that the subject law enforcement officer said or did overtly racist things in other cases or in other circumstances. Here, the defendants' statistics were fundamentally meaningless because their numerical analysis did not concentrate on similarly situated troopers as compared to Pelster, and the defendants had no evidence that Pelster spoke or acted like a racist.

Second, although the defendants may not like *Armstrong* for a variety of arguably good policy reasons, our Court of Appeals has indicated that *Armstrong* should be applied in criminal cases where a selective enforcement claim is made. *Bell*, 86 F.3d at 822–23. Accordingly, as a

judge of an inferior court, I must apply *Armstrong* even if I were to agree with the defendants' policy argument.

Third, I do not agree with the defendants' policy argument. That is, I believe that *Armstrong*, and the Eighth Circuit's application of it, provides the proper framework. There are very good reasons why selective enforcement claims based upon race (or travel) ought to be extremely hard to advance and prove. As this case illustrates, in the real world, an over sensitivity to being labeled a racist can and does deter a police officer from aggressively doing his or her duty. A judge ought not to magnify this problem by allowing these types of easily made claims to be readily advanced or lightly proven, and that is particularly true when it comes to drug transportation cases.

### *E.*

▮ The defendants argue that Pelster's Troop C supervisors sometimes criticized his emphasis on patrolling I–80 as opposed to patrolling rural areas and county roads. The defendants also spend time arguing about other matters in Pelster's personnel file. The inference to be drawn, so the defendants suggest, is a police officer who was out of control.

However, the fact is that Pelster always received satisfactory or above ratings, and, in the case of drug interdiction, an "exceptional" commendation. In March of 2002, for example, Pelster's six month review stated that: "Overall, Trooper Pelster does good work and no serious problems are noted." Exhibit 301.

---

**12.** *United States v. Mesa–Roche*, 288 F.Supp.2d 1172, 1186 n. 35 (D.Kan.2003) (holding that the defendants failed to make the required preliminary showing of "intent" under *Armstrong* and therefore discovery would be denied; stating, however, that:

"Despite the seemingly impossible burden, the Eighth Circuit requires proof that a similarly situated person was not stopped where a motorist is challenging their own stop on equal protection grounds.") (citing *Johnson v. Crooks*, 326 F.3d at 1000).

Pelster's personnel file and ratings fall entirely short of proving that he was a "rogue" police officer. In fact, the opposite appears.

### F.

■ The defendants complain about Judge Piester's refusal to admit all of Exhibit 229 into evidence. Sometime after the stop in question, Pelster was transferred from the Troop C area in central Nebraska to the Troop A area in eastern Nebraska. Exhibit 229 is a supervisory observation form authored by a Highway Patrol supervisor regarding Pelster's drug interdiction activity in Troop A. Troop A contains the largest metropolitan region in Nebraska, the City of Omaha and its suburbs. Omaha is about 140 miles from the Grand Island area where Pelster had previously patrolled and where the stop in question took place. As required by the form, Pelster acknowledged receipt of the form authored by his supervisor. This form was prepared seven months or so after the stop that is the subject of this case.

Judge Piester received into evidence a portion of the exhibit to the extent that the exhibit represented Pelster's own statements about his interdiction practices. The exhibit received in evidence, Exhibit 229–O, quotes Pelster as follows: "Trooper Pelster stated he believed the statistics showed he stopped around 60% white, 16–18% black and the remainder was other minorities. . . . Trooper Pelster stated he believed the disparity was caused by the vehicles he was focusing on while conducting interdiction."

As to the remainder of the exhibit, Judge Piester sustained a variety of objections to it, including that the exhibit was not relevant. Among other things, Judge Piester reasoned that since the document, dated July 31, 2003, appeared to reflect a discussion of Pelster's activities in a different region during a different time by different supervisors, the exhibit as a whole was not relevant.

I find no error in Judge Piester's carefully balanced evidentiary ruling. On the contrary, I agree that Judge Piester received into evidence the relevant portion of the exhibit, and left out the irrelevant portion. Furthermore, and in any event, had I considered the entirety of the exhibit, my ruling would have been the same.

### G.

■ The defendants claim that Judge Piester erred in sustaining objections to Exhibit 232 and refusing to allow the defendants to subpoena the head of the Nebraska State Patrol (Colonel Nesbitt) and other high ranking officials to question them about an e-mail that Nesbitt sent to seven individuals on October 22, 1999. The heading of the e-mail states that it deals with "Interdiction/I–80 vs State Highway Coverage Concerns" and the body of the e-mail relates to the supervision of two troopers other than Pelster. In a two-sentence portion of this much longer e-mail, Nesbitt wrote that "we should not question the ethical/moral [basis for] stopping of motorists, . . . we should address the violation." Exhibit 232.

Among other grounds, and during the evidentiary hearing, Judge Piester ruled that the e-mail was irrelevant. Earlier, on a motion to quash, Judge Piester made a similar decision (sealed filing 164) and on appeal I affirmed that decision without prejudice. (Filing 185.)

There was no harmful error in denying the admission of the e-mail. The same is true for Judge Piester's determination that it was unnecessary and improper to subpoena the high ranking officials of the State Patrol to question them about the exhibit.

First, it is an unreasonable stretch to suggest, as the defendants do, that the e-mail can somehow fairly be read as Colonel Nesbitt's approval of racial profiling or other unconstitutional behavior on the part of troopers. Second, the e-mail has nothing to do with Pelster and there is no showing that Pelster ever saw it. Therefore, there is no reason to think that it influenced his behavior. Third, the e-mail was sent three years before the incident in question arose, the e-mail was sent before Pelster was hired as a trooper,[13] and the e-mail was sent prior to the Nebraska Legislature's 2001 enactment of the statutes directing the State Patrol to collect racial and ethnic data on traffic stops so that racial profiling could be stopped if that wrongful practice in fact existed. Thus, the e-mail is both untimely generally, and specifically unrepresentative of the legal milieu in which Pelster (and the rest of the Patrol) functioned when the defendants were stopped. Fourth, had I considered the e-mail, my ruling to adopt the report and recommendation would be the same. Simply put, even if the e-mail had been received in evidence, the spin the defendants put on it is far too jaundiced to be reasonably adopted as an indication that Nesbitt (or the Patrol) favored racial profiling, and the e-mail is also far too removed from Pelster to tell us anything important about him or the facts that give rise to this case.

### III. Conclusion

There are two reasons why the motions should be denied. Although they are related, they each independently serve as a basis for denying the motions.

First, the defendants were not entitled to discovery or an extensive evidentiary hearing. They failed to met their threshold burden under *Armstrong*. Therefore, the defendants' motions should have been denied soon after they were filed.

Second, and although the defendants were incorrectly afforded wide-ranging discovery and an extensive evidentiary hearing, their evidence was insufficient under *Armstrong* or otherwise to prove that any of Trooper Pelster's actions violated the defendants' equal protection or travel rights. Neither the defendants' statistics nor their other evidence establish that Pelster's actions had a discriminatory effect or that Pelster acted with a discriminatory purpose. Additionally, there is nothing about what Pelster did that burdened the right to travel.

Accordingly,

IT IS ORDERED that:

1. Subject to this memorandum and order, the report and recommendation (filing 241) is adopted.

2. The government's objection (filing 249) to Judge Piester's failure to require the defendants to comply with *Armstrong* prior to granting them a lengthy evidentiary hearing and discovery and his failure to recommend denial of the defense motions as a result is sustained. The government's objection (filing 249) is otherwise denied.

3. The defendants' objections (filings 244, 246, and 248) are denied.

4. The government's motion for enlargement of time (filing 252) is denied.

5. The defendants' motions to dismiss or suppress (filings 49, 51, 53, 108, 111, and 123) are denied.

6. This matter is referred to Judge Piester for a trial setting.

---

13. Pelster was hired by the Nebraska State Patrol in 2000; he received his academy training between July 2000 and January 2001; and he completed his probationary training in August 2001. (Filing 241, at 7, 10.)

## REPORT, RECOMMENDATION AND ORDER

PIESTER, United States Magistrate Judge.

The defendants have filed motions to suppress evidence obtained during a December 4, 2002 traffic stop or alternatively, to dismiss the indictment.[1] Defendants' pending motions claim the traffic stop, request for consent to search, and subsequent canine sniff of their vehicle arose from racial profiling in violation of the Equal Protection Clause of the Fourteenth Amendment. Filing 49 (Hare motion to suppress); filing 51 (Fox motion to suppress); filing 53 (Edwards motion to suppress). Defendants were also granted leave to supplement their motions to claim the traffic stop violated their First Amendment right to travel. Filings 122 and 125. Specifically, defendants claim their right to travel was violated when their vehicle was stopped because it was a rental vehicle with California plates. Defendants claim that any evidence obtained during the traffic stop arose from violations of their constitutional right to equal protection and to travel, and therefore this case should be dismissed or the evidence suppressed.

Accordingly, the issues raised by the pending motions are: (1) Whether Trooper Robert Pelster violated defendants' rights under the Equal Protection Clause and/or their First Amendment right to travel by stopping defendants' vehicle on December 4, 2002; and (2) Whether Trooper Pelster's request for consent to search the vehicle and for canine assistance at the scene of the traffic stop arose from racial profiling in violation of the Equal Protection Clause.

Defendants' motions focus on the conduct of Trooper Pelster in initiating the traffic stop of their vehicle. They argue the vehicle was stopped because Trooper Pelster saw that its occupants were black. They also argue they were stopped for having California license plates. Defendant Edwards also argues that Trooper Pelster's requests to search and for canine assistance were racially motivated.

Insofar as concerns Trooper Pelster's motivation for the stop, this dispute boils down to an inquiry into his subjective thinking during a period of approximately 15–30 seconds. Ironically, despite over five days and 1200 pages of testimony, there is precious little direct evidence on the issue, even from the trooper himself. Rather, the evidence is largely circumstantial, anecdotal, and statistical, aimed at creating an inference that Trooper Pelster stopped this car because of the race of the occupants and/or the fact that it bore out-of-state license plates.

## THE EVIDENCE

In support of their motions, the defendants have presented evidence concerning Trooper Pelster's training and the methods he typically employs in conducting traffic stops; performance evaluations he received from supervisors and his compliance with their instructions; the racial breakdown of his traffic stops compared to those of other Nebraska State Patrol ("NSP") troops and troopers, and to local, state and national demographics; the racial breakdown of consent search requests; the racial breakdown of requests for canine assistance; anecdotal evidence of minority motorists he stopped; and the circumstances that led to the December 4, 2002 traffic stop, request for consent to search, and request for canine assistance at the scene.

■ In addition, the court took judicial notice of evidence presented by the gov-

---

1. The defendants' earlier motions to suppress based on alleged violations of the Fourth Amendment (filing 22, Fox motion to suppress; filing 24, Hare motion to suppress; filing 27, Edwards motion to suppress) have been denied. Filing 88.

ernment and defendants on the Fourth Amendment motions to suppress (T2, 36–37, and filings 56A & 56B). The events that occurred after the defendants' car was stopped are discussed in detail in the report and recommendation filed on the Fourth Amendment motions, Filing 73, and will not be repeated here unless necessary for clarity. The additional testimony offered for the pending motions did not controvert my previous findings or undermine my previous determination that Trooper Pelster's version of the events occurring after this vehicle was stopped is generally credible.[2]

For the reasons discussed hereafter, I conclude defendants' motions to suppress and for dismissal should be denied.

### The December 4, 2002 Traffic Stop

In late afternoon December 4, 2002, Trooper Pelster and Trooper Almquist were parked in the Interstate 80 median near Grand Island, Nebraska conversing when defendants' eastbound vehicle passed. Defendant Hare was driving that vehicle, a 2002 Dodge Caravan minivan rented by defendant Fox and bearing California license plates. T1, 59–60. Defendant Fox was seated in the right front seat, and defendant Edwards was a passenger in the vehicle's second seat. T1, 53.

Trooper Pelster did not specifically notice defendants' vehicle as it passed his parked cruiser. Shortly thereafter, he and Trooper Almquist ended their conversation and separated. Trooper Pelster entered the interstate and began to travel in the eastbound lane. T2, 899–90, 998. Although he must have caught up with and ultimately passed the defendants' vehicle while driving eastbound, Trooper Pelster did not notice it until he was preparing to enter the left passing lane of the interstate to cross the median, turn around, and proceed back west. Trooper Pelster was traveling at a speed of approximately seventy miles per hour. The speed limit at this location of the interstate was seventy-five miles per hour, and the traffic at the time was moderate to heavy. T1, 95, 126, 145. To determine if it was safe to enter the passing lane, Trooper Pelster looked in his rear-view mirror for approaching eastbound traffic. T1, 45, 94–95. In the rear-view mirror he saw defendants' vehicle move into the left lane directly in front of and what he thought was unreasonably close to a Suburban that was already driving in that lane. It appeared to him that only two car lengths separated the front of the Suburban from the rear of defendants' vehicle during this lane change (T1, 47–48, 97–98, 109–110, 140–42), and also that the Suburban was required to reduce its speed to permit defendants' vehicle into the left lane and avoid a collision. T1, 46–47. As the defendants' vehicle approached Trooper Pelster's cruiser, or as it was passing him, Trooper Pelster decided to stop the defendants' vehicle and manually started his patrol car videotape equipment.[3]

---

**2.** The transcript for the Fourth Amendment hearing of April 21, 2003 consists of two volumes of testimony, filing 56 (pages 1–305), and four exhibits (exhibits 1–4). That transcript and its related exhibits are designated T1, _____. The transcript of the equal protection and right to travel hearing was originally filed as five volumes of transcript, filings 170, 183, 202, 203, 218, consisting of pages 1–1228. Possible transcription deletions were noted and a new transcript was ordered. Filing 235. Citations in this report and recommendation to the equal protection and right to travel transcript are to the corrected volumes, filings 236 through 240, (pages 1–1233), and the seven government exhibits received (exhibits 1–7) and forty defense exhibits received (beginning with exhibit 200) in those hearings. That evidence is designated T2, _____.

**3.** The evidence is that there is a five- or six-second delay between the time Trooper Pelster starts his videotaping equipment and the

Before Trooper Pelster activated his lights to stop this vehicle, he saw what he considered possible indicia of criminal activity. T1, 74–76. He noticed that the vehicle had a California license plate, it appeared to be a rental vehicle, and it had a United States flag waving from its antenna (considered a potential "disclaimer" when attached to a rental vehicle).[4] T2, 594–96, 667–68, 872–74, 924, 992–93, 1057–58. The evidence also shows that Trooper Pelster saw at least one of the occupants of the minivan as it passed him; he testified he saw that the driver was black and was wearing a white ball cap. T2, 990.

The defendants' vehicle passed Trooper Pelster's cruiser and returned to the right lane in front of it at a distance the trooper also believed was too close for safety (approximately two car lengths). T1, 47–48, 142 T1, 110–111, 165. A few seconds later, at approximately 4:47 p.m., Trooper Pelster activated his overhead emergency lights and stopped defendants for improper passing, careless driving, and following too close. T1, 48, 166.

Intending to issue a warning to the driver, Trooper Pelster approached the defendants' vehicle on the passenger side and told the defendants the vehicle was stopped for improperly changing lanes and cutting off both the Suburban and the trooper. Trooper Pelster explained that Hare must allow more room for other moving traffic when performing lane changes, and stated, "Two car lengths is not enough." The front seat passenger, Fox, responded, "I told him that." T1, 59, ex-

hibit 4A (videotape of traffic stop). Trooper Pelster collected identification from each of the defendants and asked Hare to be seated in the patrol car. Ensuing events are described in Filing 73.

Defendants' evidence consisted largely of an examination of Trooper Pelster's training and past actions, and it is described below.

### *Trooper Pelster's Training and Past Performance*

Trooper Pelster was initially certified by the Nebraska Law Enforcement Training Center and began his law enforcement career as an officer for the Saunders County Sheriff's Department. T1, 40–41; T2, 883–84. In June, 2000, while employed by the sheriff's department, Trooper Pelster completed the Desert Snow criminal interdiction training. T2, 935, 983. Desert Snow is a training program offered internationally which teaches highway interdiction techniques and methods for searching vehicles to locate and seize illegal drugs. T2, 531.

Trooper Pelster was hired by NSP in 2000, began his NSP academy training in July 2000, completed it in January 2001, and was re-certified as a law enforcement officer by NSP. In January 2001, as part of the mandatory training for graduation from the NSP Academy, Trooper Pelster completed a three-day criminal interdiction course. T2, 533, 685, 867–68, 935. The instructor for this course was Trooper Gregory Goltz, a highly trained NSP officer who has taught criminal interdiction

---

time the video camera actually begins recording. At the court's request, the original of T1, exhibit 4 was provided to the court and marked as T1, exhibit 4A. The videotape of this stop, which starts at 16:47 on exhibit 4A, begins as defendants' minivan is completing the pass, and both its right tires have already passed over the lane marker. The minivan at this point is shown to be approximately two car lengths in front of the cruiser. As the

pass is completed, the minivan pulls away from the cruiser.

4. The term refers to the prominent display of American flags or other patriotic, law enforcement, religious, or "conservative" emblems or symbols not likely placed there by the rental company, possibly intended to convey the appearance of the patriotic law-abiding citizen. T2, 595–96, exhibit 230 at p. 12.

courses since at least 1997. T2, 533, 613–14, exhibits 230 & 230A.

Following completion of his NSP academy training, Trooper Pelster began his six-month probationary period as an NSP trooper in Troop C. T1, 40–41; T2, 886, 907. Troop C encompasses seventeen counties in central Nebraska, with its headquarters located in Grand Island, Nebraska. T2, 435, 794, exhibit 201. Trooper Pelster's field training officers during the probationary period were NSP Troopers Jeff Roby and Andy Allen. T2, 756, 759–60, 888–89. Trooper Pelster also spent one day of his probationary training accompanying and observing Trooper Duis, an NSP canine handler for Troop C. T2, 886–87.

Trooper Pelster's first Troop C supervisor was NSP Sergeant Vernon Barton. T2, 886. Sergeant Barton supervised Trooper Pelster during his probationary period and until September 16, 2001 when Sergeant Barton was called to active duty with the Nebraska Air National Guard. T2, 752–53. When Sergeant Barton returned from active duty in March 2003, he resumed supervising Trooper Pelster and continued to do so until Trooper Pelster transferred to Troop A three months later. T2, 450–51, 497, 773–74, 810. In Sergeant Barton's absence, Trooper Pelster's supervisor was Sergeant William Keeling. T2, 436–438, 773–74.

In June of 2001, while Trooper Pelster was still in his probationary period and working with his field training officer, Sergeant Barton advised Trooper Pelster to submit his reports of summons, violations, and warnings in a more orderly fashion. The issue of racial profiling in traffic stops had not been raised and was not discussed. T2, 756, 757–60, 769–70, 792–93.

To assure that Trooper Pelster was being properly trained, on June 16, 2001 Sergeant Barton counseled both Trooper Pelster and his field training officer, Trooper Allen, concerning their lack of sufficient activity (too few tickets per shift), failing to complete field interview cards documenting their contacts with an individual, and providing verbal rather than written warnings during some stops. T2, 763–67, 796–99, 888–94. The policy requiring written field interview cards was relatively new (T2, 798–800), and Sergeant Barton believed that failing to document all stops was unprofessional. T2, 799, 806. Sergeant Barton was concerned that, irrespective of the trooper's proper motive or whether written warnings were required under NSP policy,[5] verbal warnings could create an appearance of unprofessional conduct by NSP. T2, 768–69, 777, 807–08. He advised Troopers Allen and Pelster "not to put them self's [sic] or the agency in a position to be considered profiling." T2, exhibit 229C. Two days later Trooper Pelster received a completed Supervisory Observation Form which stated:

> While conducting road operations recently a situation or traffic stop(s) occurred where the driver of the vehicle was not given required documentation. No summons, warning, or violation card was issued or completed.
>
> The situation has been outlined and discussed at the shift level and by the administration. There are no verbal warnings with very few exceptions.
>
> Hopefully at this point you are aware of the atmosphere we must operate in.[6]

---

5. Verbal warnings were permitted under past NSP policy, but sometime after 2000 the policy changed. All warnings must now be written. T2, 285, 298, 487–88.

6. Although there was no testimony explaining what was meant by "the atmosphere we must operate in," LB593 was enacted by the Nebraska Legislature on May 31, 2001, only sixteen days before Trooper Pelster received this Supervisory Observation Form. To monitor whether NSP engaged in racial profiling, this new statute required NSP to report the reason for every traffic stop, the race of the

No matter what your best intentions are it is possible to be perceived by others in a negative manner. Do not place yourself in a situation where undue criticism, civil action or embarrassment could take place.

Your dedication and professionalism are too valuable to your coworkers and the agency to risk otherwise.

T2, Exhibit 300. See also, T2, 896, 912. Sergeant Barton considered racial profiling illegal and a violation of civil rights, and he required documentation of all stops to avoid future misunderstandings or the appearance of racial profiling. T2, 777–778, 780, 802–03.

Upon completing his probationary period in August 2001, Trooper Pelster was assigned to Troop C's traffic division and worked primarily the evening shift which began at 5:00 p.m. and ended at or sometime after 3:00 a.m. T2, 1061–63, exhibits 233 A–C. Road patrol officers in Troop C are assigned to patrol a particular geographical area within the Troop C boundaries, but are not assigned to patrol particular roads or sections of roads. T2, 486. Within his assigned area, Trooper Pelster preferred patrolling Interstate 80 near Grand Island and targeted his efforts to that location. T2, 775, 843. Since most of his success in criminal interdiction occurred in the eastbound lane of Interstate 80, most of Trooper Pelster's traffic stops in Troop C involved eastbound Interstate 80 traffic. T2, 793, 999. Over the last three years eastbound Interstate 80 has been used to transport very large amounts of illegal drugs. T2, 662–63.

In the NSP drug interdiction training, Trooper Pelster was trained to recognize "indicators" during a traffic stop to determine if criminal activity is occurring.

Trooper Pelster was taught that race is never an indicator because people of all types and races transport illegal drugs. T2, 541–42, 544–45, 569–70, 576–77, 592, 870, 1048. The use of race as an indicator violates the policies and regulations of NSP, (T2, 613), and limiting criminal interdiction on the basis of race would hinder an officer's efforts to stop illegal drug crimes. T2, 697–98, 1048–50, exhibit 230 at p. 5.

Sergeants Barton and Keeling, as well as other officers, were questioned about a memo authored by NSP's highest commanding officer, Colonel Tom Nesbitt. The memo stated that supervisory personnel were not to question the troopers in the field concerning whether their traffic stops were "moral" or "ethical"; however, there was no evidence offered to support a claim that either NSP or Colonel Nesbitt permitted or condoned the use of illegal conduct, including racial profiling, in performing traffic stops. In any event, neither Sergeant Barton nor Sergeant Keeling had received this memo or knew about its contents prior to preparing for the hearings on these motions. It therefore had no impact on their supervision of Trooper Pelster or the conduct they permitted within Troop C. To their knowledge, it was not a "directive" or "policy" of the state patrol. T2, 503, 788–90.

Although training troopers that race is never an indicator of criminal activity, NSP does not instruct troopers, one way or the other, concerning a vehicle's license plates or whether a vehicle is rented when determining which vehicles to stop. T2, 649–50, 651, 704. Even so, Trooper Pelster was trained that stopping a vehicle for having out-of-state plates alone is illegal,

person stopped, and whether consent to search was requested or a canine summoned to the scene. A pilot program for compliance with these reporting requirements began in

Troop C on July 1, 2001 and, pursuant to statute, mandatory reporting became effective on a statewide basis on January 1, 2002.

(T2, 586–87, 663, 881–82, 1041), and he stops only those out-of-state vehicles that commit traffic violations. T2, 1041–43, 1074. However, Trooper Pelster was also trained that in the Midwest, vehicles on Interstate 80 with license plates from a states with distribution or transportation "hub cities" for illegal drug trafficking, such as California, have a higher probability to be involved in illegal drug activity. T2, 570–571, 573, 615–616, 664–64, exhibit 230 at p. 4–5.[7]

In response to this training, Trooper Pelster "keys" or focuses his interest on vehicles with out-of-state license plates, especially the types of vehicles commonly used to transport narcotics such as U–Hauls, recreational vehicles, Ryder trucks, and minivans.[8] T2, 602–604, 626, 686–687, 924, 927–29, 927, 934–35, 950, 991, 1022, 1040–43, 1077. Consistent with his training, when Trooper Pelster initiates a traffic stop for a violation, he does not ignore the indicators present and will not permit the vehicle to leave until he is completely comfortable that illegal conduct is not occurring. T2, 546–51, 556–58, 879–881, 882, 1050–52. Trooper Pelster was also trained not to detain a vehicle absent reasonable suspicion of criminal activity. T2, 632–33.

Trooper Pelster's drug interdiction training through NSP and Desert Snow provided him with specific information concerning the statements, conduct, and physical evidence that may, when considered *in toto*, indicate criminal activity. Specifically as it relates to defendants' motions, Trooper Pelster was taught to notice vehicles displaying "disclaimers," the heavy smell of deodorizers or perfumes in the vehicle, positive responses to EPIC checks, discrepancies in the stories between vehicle occupants, rental vehicles being driven by someone other than the renter when the renter is not present, and vehicle occu-

pants that do not know each other or have no relationship to each other. T2, exhibit 230 at p. 10–12.

Trooper Pelster testified to his practices leading up to this stop on December 4, 2002 which have, for the most part, continued since that time. While working as a patrol officer, Trooper Pelster, like all other NSP troopers, writes violations, warnings, and summons (also known as citations) for traffic infractions. As defined by NSP, violations are usually issued for vehicle defects. For traffic stops related to driver conduct, such as speeding, a warning is given if no fine or court appearance is required, and a summons or citation (commonly referred to as a "ticket") is issued if a payment of a fine and/or court appearance is required. T2, 283–84.

NSP troopers have some discretion in deciding which vehicles to stop. Trooper Pelster considers the severity of the violation as well as his interest in stopping the vehicle in making that decision. In exercising discretion, Trooper Pelster is more interested in stopping vehicles displaying indicators or out-of-state plates. T2, 638–40, 997–98. He has also been trained that once he sees a traffic violation and decides to stop a specific vehicle, he should complete that traffic stop and not pursue other vehicles he later notices are also committing violations. T2, 660–61, 691.

In deciding which vehicles to stop, Trooper Pelster also engages in "de-policing," a term not used by NSP, which describes a decision-making process NSP does not teach. De-policing, by Trooper Pelster's definition, is limiting contacts with a group of people or violators. T2, 813–14, 1001, 1038–39. As applied to the race of vehicle occupants, Trooper Pelster explained that it means *choosing not to*

---

**7.** The government did not adduce any empirical evidence on this point.

**8.** Again, there was no empirical evidence adduced to support this conclusion.

*stop* a minority driver who committed a traffic violation. The term does not include *choosing to stop* a driver, including a white person, based on race or the vehicle's licence plates. T2, 1002–03, 1038–39, 1076, 1118–19. Trooper Pelster explained that perhaps as frequently as once a month, he may encounter a situation which causes him to believe he has stopped too many minority drivers. He may then choose not to stop minority traffic violators in an attempt to avoid being perceived as a racist. T2, 813–16, 821–23, 839–40, 852–55, 933–34, 950–51, 1120–21. His decision to de-police in a certain situation is not based on his written or mental tally of the percentage of minority traffic stops, but on individual situations. T2, 971–72. If, for example, he had recently stopped several minorities in a major drug seizure, he may choose to avoid stopping minorities during his next shift. T2, 852, 971–72. He did not inform his supervisors that he was de-policing based on race. T2, 824.

Trooper Pelster explained that racial de-policing could occur only during the day when he was able to see a vehicle's driver before deciding to initiate a traffic stop.[9] T2, 848. The evidence was insufficient to allow one to look at the sum total of traffic stops on a specific day, week, or month and determine that Trooper Pelster was de-policing. T2, 1042 (See T2, exhibit 233—number and racial breakdown of traffic stops by shift). He testified that on some days he spends his time patrolling the roads and writes several tickets, but on other days his time is consumed with accident or criminal investigations or testifying in court. T2, 1083–84. This variety of responsibilities and activity makes a day-to-day, week-to-week, or even month-to-month comparison of statistics uncertain in assessing whether Trooper Pelster chose not to stop minorities on a particular day or for a specific period of time.

Once a traffic stop is initiated, NSP troopers have discretion in deciding when to issue a warning instead of a citation. Trooper Pelster issues warnings for seventy-five percent of his traffic stops. T2, 867, 987–88. Based on his training, he decides whether he will write a warning or a citation before he exits his patrol car and approaches the stopped vehicle. The decision of whether to issue a warning is based on the severity of the infraction and the relative danger caused by the infraction as influenced by the volume of traffic and the road conditions. He stated it is not based on the race of the driver or the license plate of the vehicle. T2, 985–86, 1078–79.

Trooper Pelster also testified that he received training concerning the record checks he may request and the questions he may ask vehicle occupants during the course of a traffic stop. T2, 559–60, exhibit 230 at p. 9–10. He stated his questioning of vehicle occupants is conducted the same irrespective of race. T2, 1052–53. If, during the course of the traffic stop, he learns of specific facts which make him suspect that criminal activity is occurring, he always requests consent to search the vehicle,[10] but he does not ask to search the vehicle unless, given the totality of the circumstances and indicators present, he

---

9. Although Trooper Pelster was working primarily the 5:00 p.m. to 3:00 a.m. shift from August 2001 until he transferred to Troop A in June 2003, there was no evidence presented by the parties concerning whether the tickets he wrote were written in daylight or darkness, and inferences of sunrise or sunset times or other light conditions provide no basis for this report and recommendation.

10. The records of Troopers Duis and Korte also reflect vehicle searches based on probable cause with canine assistance, that is, when a drug dog was requested after probable cause already existed. Trooper Pelster did not always request consent to search under these circumstances. T2, 327–28, exhibit 3 p. 5.

suspects criminal activity is occurring. T1, 84; T2, 590–91, 1008–09, 1055, 1060, 1080. Consistent with his training, if reasonable suspicion exists and consent is denied, Trooper Pelster always calls for canine assistance. T1, 83–84; T2, 588–89, 678–681, 1010–12, 1055, 1080–81, exhibit 4. He testified that neither his request for consent to search the vehicle, nor his decision to obtain canine assistance, is based on race. T2, 1052–55, 1081–82, 1124, exhibit 4.

While performing his road patrol duties, in addition to warning, violation, and citation books, Trooper Pelster also carries a small notepad and keeps a red book in his patrol car. He keeps the notepad in his front shirt pocket in case he needs to take notes while performing his job. Once these notebooks are full and no longer useful, he throws them away. Trooper Pelster uses the red book to document the hours he works and to record his work activities, including traffic stops, by code. Trooper Pelster stated he does not use either the small notepad or the red book to tally the racial breakdown in his traffic stops. T2, 822–29, 836–37, 1046.

At the Troop C headquarters Trooper Pelster enters information, including information documented in his red book, into the NSP computer to report his facility code (where he worked on a given day), function code (the duty he performed), his mileage, gallons of gasoline used, and number of hours he worked. This time sheet computer entry does not include codes for cited traffic violations, date of birth, or the racial breakdown of the drivers in traffic stops. When the trooper hits the "enter" button, the information is forwarded by the computer to the Troop C supervisor. T2, 838–39, 864, 1044–1045.

*Supervisor Evaluations and Compliance*

Trooper Pelster testified that he initiates traffic stops for traffic violations and not solely for the purpose of criminal interdiction. T2, 1049, 1051. However, in Trooper Pelster's March 2002 supervisory review, Sergeant Keeling described Trooper Pelster's "main area of strength" as criminal/drug interdiction with "several excellent cases during the past six months." T2, exhibit 301. Sergeant Keeling noted that Trooper Pelster was continuing to improve, but that his "written activity and job focus tend to be extremely one dimensional. The vast majority of his written activity being the written warning and this limited to a very small portion of his work area. A little more balance might be warranted." T2, exhibit 301. See also, T2, 1024–25. Under Sergeant Keeling's philosophy of how the job was to be performed, which may vary from that of other supervising sergeants, Trooper Pelster was expected to patrol more of his assigned Troop C area and write more citations rather than warnings. T2, 471–73 [11], 487, 511–12, exhibit 229D. He wanted Trooper Pelster to expand the geographical area of his road patrol because he did not believe Troop C had sufficient manpower to permit a trooper to work solely on Interstate 80. T2, 444–45, 500–01, 512–13.

Despite Sergeant Keeling's instruction and preference that Trooper Pelster

---

11. The record also includes testimony offered over the government's objection concerning Trooper Pelster working unapproved overtime in October 2002. T2, 474–478, 511, exhibit 229D. The evidence was received based on defendants' claim that it would ultimately show "a habit and a persistent pattern on Trooper Pelster's part to do what he wants related to how he conducts his job." T2, 476. While it was received at the time, I commented that its relevance was questionable. T2, 478. Having received and reviewed the entirety of defendants' evidence, I conclude the relevance of evidence related to Trooper Pelster's unapproved overtime was never established.

broaden the geographic area he patrolled, Trooper Pelster continued to target his efforts in Troop C to the area of Interstate 80 near Grand Island. He believed he was most talented and could best benefit the State of Nebraska by continuing to focus on Interstate 80. T2, 775, 842, 1029–33, 1035–36. His performance review thereafter characterized Trooper Pelster's drug interdiction work on Interstate 80 as "exceptional," with ten cases in six months resulting in the seizure of significant amounts of illegal drugs. Trooper Pelster was commended for always completing and appropriately disseminating paperwork related to his criminal interdiction cases, and for his excellent job with court testimony and cooperation with prosecutors. T2, 508–510, exhibit 229E.

Trooper Pelster's supervisors reviewed his violations, warnings, and citations for errors and, as with all officers, required Trooper Pelster to correct any minor errors. T2, 469. They also reviewed the records to determine Trooper Pelster's level and location of activity, and whether there was an appropriate balance of citations and warnings issued. T2, 469–73, 505–07. In Sergeant Keeling's March 2003 annual supervisory review of Trooper Pelster, which includes the time frame of the December 4, 2002 traffic stop at issue, Sergeant Keeling noted that 98.5% of Trooper Pelster's written activity continued to be generated .from the relatively small geographic area of Interstate 80 between mile marker 312 and 332, (T2, 496, exhibit 229E). Sergeant Keeling again stated that he wanted Trooper Pelster to do a "little better job of covering his entire assigned area." T2, exhibit 229E. Despite this reservation, Sergeant Keeling consid-

ered Trooper Pelster's work performance in Troop C satisfactory or above in every evaluated area. T2, 513.

Neither Sergeant Barton nor Sergeant Keeling evaluated Trooper Pelster's warnings, violations, and summons to determine the racial breakdown of Trooper Pelster's stops. T2, 440–41, 520, 805. They had received no specific allegations or complaints against Trooper Pelster concerning racial profiling or disparate or harassing treatment toward minorities.[12] T2, 776, 795–96, 799–801, 808–09.

### Statistical Evidence

On May 31, 2001 Nebraska enacted legislation (LB593) which imposed a duty on NSP to record, retain, and report specific information regarding all traffic stops for the purpose of determining whether Nebraska law enforcement officers were engaging in racial profiling or racially disparate treatment of motorists. The requirements of LB593, codified as *Neb.Rev.Stat.* § 20–501 through 20–505, became effective January 1, 2002. To comply with the statutes, NSP now maintains a database of information compiled from the warnings, violations, and summons issued by patrol officers. T2, 223, 294, 302–304, exhibit 2. The NSP database can generate lists such as Exhibits 204 and 205 of all traffic stops (not including carrier enforcement stops) entered into the database from January 2002 through May 2003 for every NSP troop. T2, 320–321, exhibits 200A, 204 & 205.

In addition, to prepare for the legal reporting requirements of Neb.Rev.Stat. § 20–501 through 20–505, a pilot program

---

12. Evidence was received concerning a complaint against Trooper Pelster for unjustifiably stopping and then harassing the driver of a vehicle on October 21, 2001. The videotape of the stop was reviewed by NSP and the complaint was determined to be without mer-

it. Moreover, the complainant was white and therefore the existence of this complaint provides no notice of or evidence to support an allegation of racial profiling by Trooper Pelster. T2, 978–79, exhibit 229N.

was started in Troop C beginning in July 2001. However, because the records for the period of July 1, 2001 through December 31, 2001 were gathered while forms were still being developed and training adjustments were being made to assure reporting consistency, the records for the last six months of 2001 may represent only a partial collection of the information retrieved by troopers during traffic stops. T2, 312–13.

For the purpose of complying with Nebraska law and maintaining the NSP database, when completing warnings, violations, and citations, troopers must indicate the race of the driver, the reason for the stop, whether a custodial arrest was made, and whether a search was conducted. T2, 232–33, 236, 306–11, 860–61, exhibits 6 & 202. Troopers provide their supervisors with an "officer sheet" or "gray sheet" paper-clipped to copies of the warnings, violation cards, and summons they have written for a given day. After completing their review of this information, the supervising sergeants forward the troopers' traffic stop records to troop area secretaries who enter the data into the NSP database. T2, 223–24, 605–06, 1044–45. Troopers, including Trooper Pelster, do not have access to the database where citations, violations, and warnings are entered. T2, 864–65, 1045–46.

For race and ethnicity entries on the citations, violations, and warnings, NSP uses the national crime information computer race categories. T2, 357. In addition, to address the ethnicity concerns of Neb.Rev.Stat. § 20–501, a "Hispanic" category was added. T2, exhibit 210 at p. 2. While there are many other potential categories regarding ethnicity, NSP's current database does not address those. T2, exhibit 210 at p. 2. The troopers were instructed to write "A" for Asian; "B" for black; "H" for Hispanic; "W" for Caucasian; "N" for Native American; and "U" for unknown. NSP officers identify persons who appear to be of Middle Eastern descent as white. The use of "unknown" is discouraged. T2, 249–50, 305–06, 357, 999–1000, 1079.

The race of the driver is determined by the officer who initiated the stop based on that officer's visual perception. The stopped motorist is not questioned concerning his or her actual race or ethnicity. T2, 240, 304–06, 370–72, 1079. The troopers are trained that a person's appearance governs, regardless of the ethnicity of his or her surname. For example, a person who appears white should be identified as white even if he or she has a Hispanic surname, T2, 367, and a dark-skinned or black Cuban would be classified as black. T2, 861.[13]

---

13. Defendants challenge the accuracy of Trooper Pelster's racial designations on some of his tickets by arguing that he identified some individuals with Hispanic surnames as white. T2, 301, 358–365. This alleged discrepancy, however, does not necessarily undermine the credibility of Trooper Pelster's reporting, for three reasons. First, such action is consistent with the training he received.

Second, defining "Hispanic" is no easy task. According to the American Heritage Desk Dictionary (1981) "Hispanic" means "[o]f or pertaining to the language, people, and culture of Spain or Latin America." *Id.* at 464. Hispanic is not a race or skin color

but a description of ethnicity and culture. T2, exhibit 210 at p. 2. People with Hispanic surnames often have a "Hispanic" appearance, but they may also appear white, black, Native American, or Asian. Further, a white or a black person with no biological Spanish, Latin American, or Mexican ethnicity may have a Hispanic surname as a result of marriage, legal name change, or adoption. Thus, a Hispanic surname does not mean the person would necessarily appear "Hispanic" to a law enforcement officer.

Third, and most important, for the purposes of determining if officers are stopping vehicles and selectively enforcing traffic laws on the basis of race, the relevant inquiry is

Numerical violation codes are used and entered into the data base to describe the trooper's reason for initiating a traffic stop. T2, 238, exhibit 203. Information concerning whether consent to search the vehicle was requested, whether a search was conducted, and whether a canine was summoned to the scene is reported in areas designated on the tickets as Block 1, Block 2, and Block 3. T2, 313–316, exhibits 6 & 202. Although license plate numbers are also written on the violation or warning tickets, the state of the license plate is not a required entry field in the NSP data collection system. T2, 273, exhibits 234, 234A, & 234B. Therefore, for traffic stops when warnings were issued, which accounts for approximately seventy-five percent of Trooper Pelster's traffic stops, or when only vehicle defect tickets were issued, vehicle information regarding whether the vehicle had Nebraska or out-of-state licence plates is not available through the database. T2, 272–73, 867, 987, exhibits 234, 234A, & 234B.

The defendants claim the statistical evidence garnered from the NSP database and its underlying records related specifically to Trooper Pelster's traffic stops evidence Trooper Pelster's practice of selectively enforcing traffic laws against minority drivers. Defendants claim the records related to Trooper Pelster's traffic stops indicate: (1) Compared to other NSP troopers' records or the demographics of the traveling public, he stops a disproportionately high number of minorities and vehicles with out-of-state plates; (2) He under-reports or inaccurately reports his traffic stops of minorities so his racial bias can go unnoticed; (3) After a traffic stop is made, he requests consent to search and for canine assistance substantially more frequently from minority motorists than from white motorists; and (4) He stops minorities for violations he does not enforce to the same degree against white people.

1. *Traffic stops of minorities and those with out-of-state plates.*

Based on the NSP database entries for Trooper Pelster's activity for July 2001 through May 2003, the racial breakdown of Trooper Pelster's traffic stops was seventy percent white and thirty percent minority.[14] T2, 269–271, exhibit 211C (summarizes exhibit 206). The overall statistics for Troop C indicate that ninety-one percent of the vehicles stopped had white drivers. The statewide troop-by-troop statistics reflect that Troop A (the Omaha area) had the highest overall percent of minority traffic stops, with approximately twelve percent of the drivers stopped being minorities. T2, exhibit 235A.

The defendants claim these statistical comparisons prove Trooper Pelster disproportionately stops minority drivers on the

whether, before any names were gathered, the person appeared to be a minority.

While it certainly appears possible that troopers could intentionally skew their statistics by over-broadening their personal definition of "white" or even falsely reporting a person as "white," particularly in situations where no later court appearance is necessary (such as when warnings are issued), there was no convincing evidence of any such action by Trooper Pelster.

14. Before these motions were filed, Trooper Pelster had not reviewed or maintained records, or calculated the statistical breakdown of his traffic stops based on race or out-of-state licence plates. T2, 1012, 1082. He spoke with his Troop A Captain in May 2003 and, upon questioning, stated he believed the statistical breakdown of his traffic stops was about sixty percent white and forty percent minority. T2, 1012–13, 1099, 1105–06. He did not reach this conclusion by analyzing the records, and may have been basing his answer on information received from the government's attorney in this case. T2, 1013–16, 1082–83, 1098–1102.

basis of race. When asked to explain why his statistics reflected a higher percentage of minority stops than even in the Omaha area, "Trooper Pelster stated he believed the disparity was caused by the vehicles he was focusing on while conducting interdiction." T2, exhibit 2290. See also, T2, 1106–1108. Trooper Pelster explained that he was keying on out-of-state vehicles due to the higher propensity for criminal activity. T2, 1116–07, 1126.

At first glance these figures do present an alarmingly high variance between Trooper Pelster's stops and those of other troopers or troops. However, there is no showing that any other troopers or any other troops within Nebraska focus 98.5% of their traffic patrol efforts on Interstate 80 travelers, or more specifically Interstate 80 travelers in the Grand Island area. Troopers in Troop C are assigned a specific geographic area within the seventeen-county area of that Troop. Irrespective of Trooper Pelster's focus on Interstate 80 traffic within his assigned area in Troop C, in possible defiance of his supervisors' directives, there is also no evidence of how Trooper Pelster's traffic stops statistics compared to other Troop C officers who were assigned to patrol the same geographic area within Troop C. For example, it is certainly plausible that the roadways of Garfield, Valley, and Greeley counties, located a substantial distance from Interstate 80, would not attract the same travelers as Interstate 80. Without some evidence to explain why the comparison would be valid, it is difficult to reach any firm conclusions from comparing Trooper Pelster's Interstate 80 traffic stop statistics to an overall statistical total that includes traffic stops within rural areas of Nebraska.

As acknowledged by the defendants' statistical expert, Dr. Carol Ebdon, the same issue arises when Trooper Pelster's statistics are compared to the racial composition of Hamilton County, Nebraska, the State of Nebraska, and the United States. Dr. Ebdon is a University of Nebraska professor who, through her education and experience, is qualified to perform statistical comparisons of data to substantiate or dispute perceived trends or causal relationships. T2, exhibit 211B. Using accepted chi-square statistical methods, she compared the data of Trooper Pelster's traffic stops with the 2000 Census data for Hamilton County, the State of Nebraska, and the United States to determine if there was a statistically significant disparity between the racial breakdown of the traffic stop data compared with what one would expect in each of these populations. When she performed her analysis, she did not know where the December 4, 2002 traffic stop occurred. T2, 384–390, 392, 399–403, 430, exhibits 211, 211A & 212.

As explained in the May 23, 2003 "Report to the Legislature on Data Submitted by Law Enforcement per LB593:2001," (T2, exhibit 210):

> Studies that focus on the driver data often compare the data to the racial breakdown of a certain population. If the stops or activity reported is disproportional that can indicate issues with how the stops are made. However, having a workable population group to compare to is difficult. Some studies compare stop data to the racial breakdown of the general population, of licensed drivers, of at risk drivers (say, those involved in accidents) or even to racial breakdown of drivers actually observed on an area's roads by people stationed in the field. All of these have problems and strengths but there is no agreed upon methodology or at risk populations or comparison groups.

T2, exhibit 210 at p. 3.

Dr. Ebdon's Hamilton County comparison assumed all Interstate 80 drivers were

from Hamilton County and all Hamilton County residents who responded to the national census were driving on that road. T2, 420–21, 426. The Nebraska population comparison was based on the assumption that all Nebraska residents drive on Interstate 80 in the Grand Island area and all Interstate 80 drivers are Nebraska residents. T2, 394–95. Likewise, the comparison of Trooper Pelster's traffic stops with United States Census data assumed all residents of the United States drive on Interstate 80 in the Grand Island area and all interstate drivers are from the United States. T2, 427–428. Dr. Ebdon did not know the racial demographics of the population subject to being stopped by Trooper Pelster, and did not know the percentage of traffic violations committed by minority drivers. Although Nebraska statutory law requires collecting race and violation data for traffic stops, there are no known studies concerning the demographics of traffic on Interstate 80 in Nebraska with respect to race in general, the breakdown of nighttime drivers by race or traffic violation, or the rate of traffic violations committed by minorities or out-of-state drivers. T2, 348–49, 1007, 1189–90, exhibit 210 at p. 3.

Dr. Ebdon concedes that the racial percentages of those traveling Interstate 80 near Grand Island, Nebraska is not the same as the racial breakdown of the county, state, or nation. Dr. Ebdon admits that her inability to compare Trooper Pelster's traffic stop history with the racial breakdown of those actually traveling the highways he patrolled undermines the validity of her statistical analysis and conclusions. T2, 394–396, 400–01, 416–417, 423–30. I agree and therefore conclude that Dr. Ebdon's analysis and resulting opinions are not helpful in addressing the issues before the court on these motions.

There was likewise no reliable evidence of the percent of Nebraska highway traffic, or more specifically Nebraska's Interstate 80 traffic, traveling in vehicles with out-of-state license plates. Trooper Pelster's personal opinion, which was formed based on general observation and no mathematical analysis, was that 50% of those traveling on the interstate near Grand Island, Nebraska had out-of-state license plates, with possible variations for time of day and day of the week. T2, 847, 1017–21, 1082–84. Although his opinion may have experiential support, it is not empirical evidence, and therefore, I conclude Trooper Pelster's opinion on this subject is not sufficiently reliable in these proceedings.

Moreover, there is no evidence of what percent of Trooper Pelster's traffic stops were of vehicles with out-of-state license plates. While that data may be available from the NSP database for traffic stops resulting in citations, it is not available from that source for stops resulting in only warnings. Since Trooper Pelster issued warnings in seventy-five percent of his traffic stops, the court has no evidence concerning the state source of license plates on any of those vehicles.

2. *Claim of under-reporting minority traffic stops.*

To create an inference of Trooper Pelster's alleged racial bias, the defendants claim that Trooper Pelster failed to accurately report his traffic stops, resulting in under-reporting to the NSP database, exclusion of some stops, and the failure to report searches requested and conducted. T2, 273–278, exhibit 226. They claim a comparison of the reports of canine handlers who assisted Trooper Pelster (Trooper Korte (Exhibit 207); Trooper Duis (Exhibit 208); Trooper Covert (Exhibit 209)), with NSP database entries for all of Trooper Pelster's traffic stops (T2, 286 and exhibit 206) reveals that required information is missing from the NSP database because Trooper Pelster failed to report it.

See T2, exhibit 226 (summary comparing exhibit 206 with exhibits 207, 208 & 209).

Exhibit 226 summarizes defendants' claims of incomplete or inaccurate reporting by Trooper Pelster. It includes two entries for traffic stops occurring prior to July 1, 2001. As Exhibit 226 notes, the NSP computer data for Trooper Pelster's traffic stops (exhibit 206) begins on July 1, 2001 and would not include traffic stops occurring before that date. See also T2, exhibit 3 at p. 5. Further, any records predating January 1, 2002 were generated as part of the pilot program NSP initiated in Troop C in preparation for meeting the new statutory requirements, and for that

reason alone those records may be incomplete or inaccurate.[15] T2, 312–13. Under such circumstances I do not consider alleged discrepancies in Trooper Pelster's reporting for events occurring prior to January 1, 2002 to be the result of any deliberate effort to hide his alleged racial bias from supervisors or the public.

Defendants' Exhibit 226 includes six entries of alleged unreported traffic stops for 2002. One of these traffic stops, the stop of a white person, is not listed in Exhibit 206;[16] one stop of a black person is correctly listed;[17] and two of the traffic stops list the person stopped as white rather than black.[18] The two remaining "unlist-

---

**15.** Exhibit 226 references three occasions when Trooper Pelster requested a canine handler between July 1, 2001 and December 31, 2001. Naamneh Basheer (identified as white) was stopped for speeding at approximately 17:20 on November 13, 2001. T2, exhibit 208. Exhibit 206 includes Trooper Pelster's traffic stop of a white person on November 13, 2001 at 17:12, with no reference to a search of the vehicle or a finding of contraband. Presumably the stop at 17:12 is the stop of Mr. Basheer, but there is no traffic ticket in evidence related to this stop.

There is likewise no ticket in evidence related to Trooper Pelster's traffic stop of a Hispanic on November 15, 2001 at 14:19. See T2, exhibit 208. The stop was, however, reported because it is included in the NSP database listing for Trooper Pelster's stops. T2, exhibit 206.

The tickets in evidence for the stop of Truman Wimberly in December 2001 state he was stopped at 3:33 on December 29, 2001. T2, exhibits 208, 223 & 224. Exhibit 206 includes no traffic stop by Trooper Pelster for that date and time. The defendants argue that Wimberly's traffic stop is included in Exhibit 206 at 19:42 on December 28, 2001, and that this data entry therefore corroborates Wimberly's testimony of an impermissibly long detention. The database reflects entries from tickets, not from any verbal or written information from the trooper. There is no evidence, whether presented as a ticket or by testimony, explaining why a data entry person would type in 19:42 on December 28, 2001 to enter Mr. Wimberly's stop rather than

the information received from the trooper (exhibit 208) which also matches the tickets received by Mr. Wimberly, (exhibits 223 and 224). I therefore conclude the December 2001 traffic stop of Mr. Wimberly was not included in the NSP database.

**16.** Exhibit 226 states Trooper Pelster failed to report the traffic stop of a white person on February 20, 2002. The Korte records do not include a traffic ticket and this stop is not listed on Exhibit 206. See T2, exhibits 3 & 207.

**17.** The February 6, 2002 Korte record relates to a February 5 traffic stop that occurred at 23:40. Contrary to defendants' claim, the stop of this black person was accurately included in the Exhibit 206 record.

**18.** The Exhibit 226 entry for January 27, 2002 is included in Exhibit 206, but Trooper Pelster identified the person as white while Trooper Korte identified him as black. There is no evidence to explain the discrepancy between these troopers' visual perception and identification of this violator's race.

The December 4, 2002 entry on Exhibit 226 is listed in Exhibit 206. Trooper Pelster's citation for "No Operator's License" and Trooper's Korte's record identified the violator as black. T2, exhibit 207. Trooper Pelster's warning ticket for speeding shows an initial race entry of "B" with "White" written over it. T2, exhibit 207. The December 4 traffic stop was entered as white in the database. T2, exhibit 206. There is no evidence

ed" canine searches did not originate from traffic stops and therefore were not included in the NSP database.[19]

The remaining ten reporting discrepancies outlined in Exhibit 226 relate to Trooper Pelster's alleged failure to indicate on his tickets whether consent to search was requested, whether a search was conducted, and whether contraband was found. For four of these entries, Trooper Pelster indicated in Block 2 of the ticket whether consent was denied or, if granted, whether it was written or verbal, but he neglected to mark in Block 1 that consent was requested.[20] Although Trooper Pelster reported what happened during the traffic stop, absent a mark in Block 1, data entry personnel did not enter that consent to search was requested. T2, 313–316, 318–19. For three of the listed stops on Exhibit 226, Trooper Pelster failed to enter any data on the ticket related to searching the vehicle.[21] In another case listed on Exhibit 226, a probable cause search was conducted and consent was not requested.[22] For one of the stops listed in Exhibit 226, a canine was used but no search was requested or conducted and no

contraband was found.[23] Finally, in one case, Trooper Pelster completed the ticket correctly but the NSP data entry was incomplete.[24]

Again, while at first blush this appearance of discrepancies is disturbing, the actual evidence is insufficient to show that Trooper Pelster deliberately misreported traffic stop information to hide a practice of racial profiling. Occasional reporting mistakes, many of which can be explained, are insufficient to prove racial bias.

3. *Claim of racially disproportionate requests for consent to search or for canine assistance.*

In response to Exhibit 226 and the alleged discrepancies in Trooper Pelster's tickets and the related database entries, NSP Captain Rhonda Lahm reviewed Trooper Pelster's traffic stops to compile data concerning every traffic stop where Trooper Pelster requested consent to search a motorist's vehicle. The Exhibit 4 summary created by Captain Lahm was based on not only the NSP database consent search data, but a review of the hun-

---

of who changed the race identification on the warning ticket, why that was done, or why the data entry person chose to enter the warning ticket rather than the citation information into the database. There is also no evidence of which racial identification was accurate.

**19.** The November 20, 2002 citation was for possession of a stolen vehicle and flight to avoid arrest. See T2, exhibit 3 p. 5 & exhibit 207. The February 19, 2002 search was Truman Wimberly's recreational vehicle, which was parked in a motel parking lot when a canine was called to that location. See T2, exhibit 3 p. 5 & exhibit 208.

**20.** See February 5, 2002 stop of Alphonso Triplett (Exhibit 207); February 15, 2003 stop of Larry Moss (no search conducted) (Exhibit 207), January 28, 2002 stop of Mark Harris (Exhibit 208); June 11, 2002 stop of Bryan Burgess (Exhibit 208).

**21.** See January 16, 2002 stop of Victor Cardenas–Echavarria (Exhibit 207); March 20, 2002 stop of Lavern Long (T2, exhibit 3 at p. 1 & exhibit 207); June 5, 2002 stop of Weylin Bush (T2, exhibit 3 at p. 4 & exhibit 209).

**22.** See January 30, 2002 stop of Ealton Wiliamson. T2, 327, exhibit 3 at p. 5 & exhibit 207.

**23.** See January 30, 2003 traffic stop of Fred Ford. Exhibit 207. Of note, the January 30, 2003 ticket specifically states "NO CONSENT REQUESTED"; however, the government's summary of this ticket states that request was denied. T2, exhibit 3 at p. 2.

**24.** See May 28, 2002 stop of Villegran Concepcion. Exhibit 207. Exhibit 206 lists this traffic stop, but contrary to the information provided on the warning ticket, it does not indicate that a search was conducted and contraband found.

dreds of underlying summonses, violations, and warning documents written by Trooper Pelster, the police dog service reports in Exhibits 207, 208, and 209, and, where appropriate, the narrative of any criminal case reports. T2, 322–28, 331–333. See also, T2, exhibit 3[25] at p. 1–4. Captain Lahm reviewed this raw data to locate every traffic stop where, in the absence of probable cause, Trooper Pelster requested consent to search or canine assistance.[26] From this subset of data, totaling eighty-nine stops (five and one-half percent of Trooper Pelster's 1636 total stops[27]), she computed the number of consent searches requested by race, and within each race computed the number of times when consent was given or denied, contraband was located, and a canine was used. T2, 335–345, exhibit 4.

Of the eighty-nine traffic stops where Trooper Pelster requested consent to search, approximately half of the drivers were minorities. T2, exhibit 4. Where consent was given, a canine was called to the scene only three times, but in *every* case where consent was denied, irrespective of race, Trooper Pelster requested canine assistance. T2, exhibit 4. Assuming that a total of eighty-nine can even yield statistically significant analysis, approximately forty-seven percent of minority drivers who were asked to consent to a search refused, while less than twenty percent of whites refused a consent search. See T2, exhibit 4. Accordingly, of the thirty-

three[28] traffic stops made by Trooper Pelster between July 1, 2001 and May 31, 2003 involving canines, twenty-four, or approximately seventy-two percent were of minorities. T2, exhibit 4. In total, a canine was used in five percent of Trooper Pelster's minority traffic stops, and in approximately two percent of all his traffic stops occurring between July 1, 2001 and May 31, 2003.[29]

4. *Claim of selective enforcement of careless driving and improper passing violations against minority drivers.*

The defendants claim that Trooper Pelster racially profiles by stopping a disproportionate number of minorities for careless driving and improper passing. They claim that, unlike speeding, these traffic violations allow the law enforcement officer to exercise broader discretion in determining if a violation has occurred and, in the case of Trooper Pelster, this discretion is used to justify stopping minorities when whites are not similarly stopped.

Using the NSP database, Captain Lahm retrieved the total number of Trooper Pelster's traffic stops for passing violations and careless driving by race. T2, 345–349, exhibit 5. Of the 1295 traffic stops Trooper Pelster initiated between July 1, 2001 and December 4, 2002,[30] sixty-five or approximately five percent were for passing violations or careless driving. T2, exhibit 5.

---

25. This exhibit was initially misidentified in the record as exhibit 4. T2, 322.

26. The data in T2, exhibit 4 therefore does not include those stops listed as excluded at page 5 of T2, exhibit 3. T2, 342–43.

27. See T2, exhibit 211C.

28. See exhibit 4. Defendants' T2, exhibit 225 reflects 38 stops with canine assistance. However, two of these occurred before July 1, 2001 and two requests for canine assistance

(February 19, 2002—Truman Wimberly; and November 20, 2002—Edgar Triguerosa) did not arise from traffic stops. See T2, exhibit 3 at p. 5.

29. These totals were computed by comparing the information reflected in Exhibit 4 to the total numbers of traffic stops set forth in defendants' exhibit 211C.

30. This total was computed from exhibits 233A and 233B.

Between December 5, 2002 and May 31, 2003, ten of Trooper Pelster's 341 traffic stops,[31] approximately three percent, were for passing violations or careless driving. T2, exhibit 5. Of these seventy-five traffic stops, forty-two or approximately fifty-six percent were of white motorists. Approximately six and one-half percent of Trooper Pelster's 489 traffic stops of minorities between July 1, 2001 and May 31, 2003 were for passing or careless driving violations, compared to three and one-half percent of such stops of whites.[32]

### Anecdotal Evidence of Alleged Racially Motivated Traffic Stops

The defendants have offered the testimonial evidence of Lavern Long, a black man from Battle Creek, Michigan; Concepcion Villegran, a Hispanic man, Mexican citizen, and permanent resident of the United States; and Truman Wimberly, a black man from Oregon. Each of these witnesses testified that, while traveling through Nebraska on Interstate 80, they were stopped by Trooper Pelster because of their race. The following testimony was provided by these witness.

Lavern Long was stopped in March 20, 2002 while traveling eastbound on Interstate 80 from Arizona. His girlfriend, who was also black, was a passenger in the vehicle. Mr. Long passed a trooper, later determined to be Trooper Pelster, who was parked in the interstate median. After Mr. Long's vehicle passed, Trooper Pelster entered the eastbound lane of the interstate, followed Mr. Long for three or four minutes, passed Mr. Long, and again parked in the median. There were many vehicles traveling at the location of Interstate 80 at that time. When Mr. Long's vehicle passed Trooper Pelster's patrol vehicle again, Trooper Pelster initiated a traffic stop. T2, 38–43, 54. Trooper Pelster told Mr. Long that he was being stopped for having a frame around his license plate and for crossing the white line on the side of the road. Mr. Long's vehicle had an Arizona rear license plate and no plate on the front. A front plate is not required under Arizona law. The frame around the rear plate had been present since the vehicle was purchased in 1977 and had never been the subject of any traffic stop before. Mr. Long testified that he knew he had not crossed the side line because, as a long-time truck driver, he would have noticed that in his rear and side mirrors. T2, 45–46, 52, 58. Mr. Long, who had a prior felony conviction for assault with a deadly weapon, was asked if he possessed any weapons. He said, "No." He was asked if he would consent to a search of his vehicle. Mr. Long was initially silent, but then agreed to the search. He explained to the court that he had already been stopped twice on this trip and his vehicle had previously been searched in both New Mexico and Colorado. A canine was called to the scene but did not alert or indicate to the odor of illegal drugs. The traffic stop occurred at 6:49 p.m. as the sun was going down. Mr. Long claims the traffic stop lasted about three hours with the search taking a little over an hour. He described Trooper Pelster's demeanor as polite and unoffensive during the entirety of the traffic stop. Mr. Long did not lodge any complaint with NSP regarding this traffic stop. T2, 47–49, 55–57, 59–60, 61, exhibit 216.

On May 22, 2003 at approximately 8:38 p.m., Concepcion Villegran was driving eastbound on Interstate 80 in Nebraska when his vehicle was stopped. Consistent with the law of New Mexico, the vehicle had a New Mexico rear license plate and no front plate. Mr. Villegran stated he

---

**31.** This total was computed from exhibits 233B and 233C.

**32.** This percent was computed from the data within T2, exhibits 5 and 211C.

was, at all times, traveling below the posted interstate speed limit because his vehicle needed transmission repair. He claims he was traveling seventy miles per hour in the seventy-five mile-per-hour zone, but when he saw the sign directing him to reduce his speed to fifty-five miles per hour, he slowed to fifty miles per hour. T2, 68–76.

According to Mr. Villegran, Trooper Pelster's patrol car was hiding in the grass of the median, just beyond a bridge, and facing west when Mr. Villegran's eastbound vehicle passed. Trooper Pelster exited the median, caught up with Mr. Villegran, and initiated a traffic stop. Trooper Pelster did not pass or travel parallel to Mr. Villegrans' vehicle before stopping it. According to Mr. Villegran, when the stop was initiated, there were other vehicles, including a Sears van, that were traveling faster than Mr. Villegran's vehicle but were not stopped. Although Mr. Villegran testified that the drivers of these other vehicles were white, in his statement prior to trial he mentioned only the Sears van and did not see that its driver was white. T2, 76–79, 85, 91, 744–745.

About fifteen minutes after the stop was initiated, and while Mr. Villegran was seated in Trooper Pelster's patrol car, Mr. Villegran consented to a search of his patrol car. Within thirty minutes of the stop, a canine had arrived at the scene. Trooper Pelster searched the vehicle and a canine sniff was carried out, but nothing illegal was found. Mr. Villegran claims the search of the vehicle lasted abut two and one half hours, and that, as a result of the search, he was unable to report to work at 6:00 a.m. the next morning in Chicago. Trooper Pelster issued a warning ticket to Mr. Villegran for speeding, and was not offensive or rude to Mr. Ville-

gran during this traffic stop. Mr. Villegran did not complain to the Nebraska State Patrol about Trooper Pelster's actions. T2, 81–84, 89, 93–94, 97–99, 103, exhibit 220.

Truman Wimberly stated he was stopped shortly before midnight on December 28, 2001 (see footnote 15) while traveling eastbound on Interstate 80 in Nebraska. Mr. Wimberly was driving a Winnebago Spirit in an isolated and dark area of the interstate. The vehicle was a twenty-two foot recreational vehicle and motor home equipped with clear windows. The driving lane was rough so he signaled and moved into the passing lane. When the driving lane became smooth, Mr. Wimberly signaled and returned to the driving lane.

Although Mr. Wimberly testified that Trooper Pelster pulled along side the motor home in the passing lane then dropped back behind it and initiated his flashing lights, prior to the hearing he stated that the first time he noticed the trooper's vehicle was when he saw its activated flashing lights in his rearview mirror. Assuming that the trooper did drive alongside Mr. Wimberly's Winnebago, it is possible that, prior to stopping the vehicle, Trooper Pelster could have seen that the driver was black; it probably would have been difficult, though, because of the height of the Winnebago, the darkness, and the trooper's position in the passing lane when Mr. Wimberly was in the driving lane. The vehicle was not registered to Mr. Wimberly, so any information from radio dispatch prior to the stop would not have identified Mr. Wimberly as the driver nor advised the trooper of Mr. Wimberly's race.[33] It is more likely that Trooper Pelster's first opportunity to identify Mr. Wimberly as

33. Theoretically, if the Winnebago was registered to a black person with a criminal record, Trooper Pelster might have been given

such information from the dispatcher; however, there was no such evidence.

the driver was when he contacted Mr. Wimberly during the traffic stop.

Trooper Pelster explained that he had stopped the vehicle because of erratic driving and the officer was concerned that the driver may be intoxicated. T2, 112–116, 121–124, 136–138, 145, 171, 188, 192–197, 741, exhibit 1. Mr. Wimberly was asked to exit the vehicle. Since he was alone with the officer on a dark highway, he felt vulnerable and frightened, and he refused to exit the vehicle. Trooper Pelster returned to his patrol car and called for backup. A second officer arrived and also asked Mr. Wimberly to exit his vehicle. Mr. Wimberly refused. A canine unit was called to the scene. When the canine officer arrived, Mr. Wimberly was less frightened because he did not believe all three officers would "be in cahoots" with a motive to hurt him. He therefore voluntarily exited the vehicle and consented to a vehicle search. T2, 125–127, 131–134, 208–209.

According to Mr. Wimberly, after about three hours of searching his vehicle, Trooper Pelster presented Mr. Wimberly with a ticket for driving on the shoulder of the road and a defective brake light. Mr. Wimberly refused to sign this citation even after being advised that he could be additionally cited and placed in jail for refusing to sign. Mr. Wimberly was then cited for refusing to sign a citation, was placed in jail, and his vehicle was towed to that location. He bonded out of jail immediately, but was required to later appear in court in Nebraska for that ticket. T2, 145–147, exhibits 212, 223 & 224. Mr. Wimberly claims that when he returned to his vehicle, he found the contents, including his clothing, strewn on the floor. He claims some of the fixtures inside were broken and the roof needed repair. T2, 148–149, 151.

On February 18, 2002, Mr. Wimberly returned to Aurora, Nebraska to appear in court on the ticket he received on December 29, 2001. His hearing was scheduled for the morning of February 19, 2002. Mr. Wimberly was driving his Winnebago, exited the interstate, and went to a motel in Aurora, Nebraska at around midnight to check in. No one answered at the front desk. He returned to his motor home, left it parked in the motel parking lot, and went to bed. T2, 152, 154, 158–159, exhibit 212.

He was later awakened by pounding on the motor home door. Trooper Pelster, along with four other officers, advised Mr. Wimberly that a canine sniff of the motor home had been conducted, the dog had smelled drugs, and the motor home would be searched. According to Mr. Wimberly, the officers searched the motor home for an hour and a half, leaving even more disarray than after the December search, but no drugs were found. T2, 162–165.

During his February 19, 2002 appearance, plea, and sentencing proceeding before Hamilton County Judge Gary F. Hatfield, Mr. Wimberly complained about the allegedly destructive search of his mobile home the previous night. Judge Hatfield briefly recessed the proceeding and, along with a deputy sheriff, investigated the recreational vehicle parked near the courthouse. When Judge Hatfield returned to his courtroom after inspecting the vehicle, he advised Mr. Wimberly that a transcript of the proceeding would be forwarded to the Troop Captain, but he did not comment on what he observed or believed concerning Wimberly's allegations of racial harassment. T2, exhibit 212 at p. 17–20.

Based on the totality of this extensive factual record, the defendants claim the December 4, 2002 traffic stop of their vehicle was based on race and the out-of-state licence plates on their vehicle. They claim Trooper Pelster's conduct following the stop further evidenced his racial bias against them. The defendants claim

Trooper Pelster violated their rights under the Equal Protection Clause of the Fourteenth Amendment and their First Amendment right to travel, and therefore that this case should be dismissed or all evidence arising from the traffic stop and subsequent search of their vehicle must be suppressed.

## DISCUSSION AND ANALYSIS

 The defendants' motions raise what is commonly referred to as a selective enforcement claim. So long as they act within the bounds of the constitution, law enforcement officers are given discretion in making decisions concerning when to make or terminate an arrest. *Deuser v. Vecera*, 139 F.3d 1190, 1195 (8th Cir.1998)(citing *Redmond v. United States*, 518 F.2d 811, 816–17 (7th Cir.1975)("It cannot be denied that the Government has a duty to maintain law and order, but how best to fulfill this duty is wholly within the discretion of its officers ...")). See also, *Allee v. Medrano*, 416 U.S. 802, 837, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974)(Burger, J., concurring in part and dissenting in part)("One step removed from the decision of the prosecutor to prosecute is the decision of the policeman to arrest.... Just as is the case with prosecutors, the police possess broad discretion in enforcing the criminal laws"); *Johnson v. Crooks*, 326 F.3d 995, 998 (8th Cir.2003)("Even routine traffic violations may require some investigation into the motorist's conduct or condition, followed by the exercise of judgment in deciding how to enforce the traffic laws in that situation"). Selective law enforcement is actionable under the constitution if an officer's decision to enforce the law is made either in retaliation for the exercise of a constitutional right or because of membership in a vulnerable group. *Es-*

*mail v. Macrane*, 53 F.3d 176, 178–179 (7th Cir.1995)(citing *Wayte v. United States*, 470 U.S. 598, 607–08, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)).

### *Unlawful Selective Enforcement: The Equal Protection Clause of the Fourteenth Amendment*

 "[T]he Constitution prohibits selective enforcement of the law based on considerations such as race. The constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." [34] *Johnson*, 326 F.3d at 999 (quoting *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). See also, *Farm Labor Organizing Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 533 (6th Cir.2002). An officer's reasonable belief that probable cause exists for a traffic stop does not affect the availability of a separate selective enforcement claim under the Equal Protection Clause. *Vakilian v. Shaw*, 335 F.3d 509, 521 (6th Cir.2003). See also, *Marshall v. Columbia Lea Regional Hosp.*, 345 F.3d 1157, 1166 (10th Cir.2003). The protection against selective enforcement afforded under the Equal Protection Clause may become relevant even before the officer initiates the traffic stop. *United States v. Avery*, 137 F.3d 343, 352 (6th Cir.1997). While an officer's subjective intentions play no role in a probable cause analysis under the Fourth Amendment, an officer's discriminatory motivation to stop of vehicle because of the race or ethnicity of its occupants can give rise to an Equal Protection claim. *Farm Labor Organizing Comm.*, 308 F.3d at 533.

 To prevail on their Equal Protection claim, the defendants must prove that Trooper Pelster subjected them "to un-

---

**34.** The defendants' Fourth Amendment motions to suppress have been denied. See, filing 88.

equal treatment based upon their race or ethnicity during the course of an otherwise lawful traffic stop...." *Farm Labor Organizing Comm.*, 308 F.3d at 533. Such racially selective law enforcement "violates this nation's constitutional values at the most fundamental level." *Marshall*, 345 F.3d at 1167. Traffic stops based on race or ethnic appearance send the underlying message to all citizens that those who are not white are judged first by the color of their skin, and send a clear message that "those who are not white enjoy a lesser degree of constitutional protection—that they are in effect assumed to be potential criminals first and individuals second." *United States v. Montero-Camargo*, 208 F.3d 1122, 1135 (9th Cir.2000)(Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where Fourth Amendment's particularized or individualized suspicion is required). "Law enforcement officials should always be cognizant of the impressions they leave on a community, lest distrust of law enforcement undermine its effectiveness." *Brown v. City of Oneonta, New York*, 221 F.3d 329, 339 (2d Cir.2000).

■ An equal protection violation can arise from a law or policy that expressly classifies persons on the basis of race, (see *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213, 227–29, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)), or from a facially neutral law or policy that has a discriminatory effect on an identifiable group when applied in an intentionally discriminatory manner. *Brown*, 221 F.3d at 337(citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–65, 97 S.Ct. 555, 50 L.Ed.2d 450

(1977)). Where the challenged law or policy contains an express racial classification, the classification is subject to strict judicial scrutiny. Challenging an overtly discriminatory law does not require proving discriminatory intent. *Wayte*, 470 U.S. at 610 n. 10, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)(citing *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880)). See *Brown*, 221 F.3d at 337 (where police criminal investigation of blacks was not based on state policy or profile which included race to identify suspects of violent crime, but focus on race was based on the physical description given by a specific crime victim, the Equal Protection clause was not violated).

■ Even absent any express racial or ethnic classification in the challenged law, enforcing a law against a minority group on the basis of racial or ethnic discrimination violates the Equal Protection Clause.

> Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution.

*Yick Wo*, 118 U.S. at 373, 6 S.Ct. 1064(Chinese defendants unlawfully imprisoned for operating laundry where two hundred Chinese laundry owners were denied permits but eighty similarly situated but non-Chinese owners received permits).

■ "[O]rdinary equal protection standards" govern claims alleging racially selective enforcement of facially neutral laws. *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) [35](quoting *Wayte*, 470 U.S. at

---

**35.** Despite my personal view that an argument can be made that *Armstrong* is distinguishable because it is a selective prosecution case and prosecutors have been accorded considerably more discretion than law en-

608, 105 S.Ct. 1524). Specifically as applied to this case, to prevail on their equal protection claim, the defendants must prove that Trooper Pelster's decision to stop their vehicle or his conduct during the traffic stop was: (1) motivated by a discriminatory purpose, and (2) had a discriminatory effect on the identifiable group to which the defendants belong. *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996)(citing *Hunter v. Underwood*, 471 U.S. 222, 105 S.Ct. 1916, 85 L.Ed.2d 222 (1985)(equal protection violation where evidence proved state had enacted a provision for the purpose of disfranchising blacks and the law had a discriminatory effect on blacks as compared to similarly situated whites)). See also, *Johnson*, 326 F.3d at 999–1000(§ 1983 claim alleging selective enforcement of traffic laws in violation of the Equal Protection Clause); *United States v. Bell*, 86 F.3d 820, 823 (8th Cir.1996)(alleged selective enforcement of bicycle headlamp law); *Farm Labor Org. Comm.*, 308 F.3d at 533–36; *Chavez v. Illinois State Police*, 251 F.3d 612, 635–36 (7th Cir.2001)(§ 1983 suit alleging state police used racial classifications in deciding whom to stop, detain, and search in enforcing traffic laws); *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir.1996)(applying *Armstrong* in denying defendant's attempt to present evidence of trooper's prior traffic stops to prove officer escalated traffic stops of young black males into drug investigations); *United States v. Anderson*, 923 F.2d 450, 453–54 (6th Cir.1991)(no discriminatory purpose found where sheriff checked felony record of black defendant following traffic stop though he did not perform background checks on all persons he arrested).

"To establish discriminatory effect in a race case, the claimant must show people of another race violated the law and the law was not enforced against them." *Bell*, 86 F.3d at 823. Discriminatory effect may by proved with specific evidence of similarly situated non-minority motorists who were not stopped for the traffic violation, or with statistical or other evidence which generally proves that members of a protected racial group—in this case African Americans—receive less favorable treatment than nonmembers. *Chavez*, 251 F.3d at 636; *Farm Labor Organizing Comm.*, 308 F.3d at 534; *United States v. Barlow*, 310 F.3d 1007, 1010 (7th Cir.2002).

To show discriminatory purpose, the defendants must prove that Trooper Pelster's decision to stop their vehicle was at least partially based on race. *Bell*, 86 F.3d at 823 (citing *Brown*, 9 F.3d at 1376). Discriminatory purpose "implies more than...intent as awareness of consequences. It implies that the decision maker...selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *United States v. Brown*, 9 F.3d 1374, 1376 (8th Cir.1993)(quoting *Wayte*, 470 U.S. at 610, 105 S.Ct. 1524). A defendant alleging selective law enforcement based on race need not prove the officer lacked any race-neutral reason for conducting the traffic stop. *Farm Labor Organizing Comm.*, 308 F.3d at 538. "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the [practice] bears more heavily on one race than another." *Washington v. Davis*, 426 U.S.

forcement officers in the field, *Armstrong* is "the law of the case" as far as this matter is concerned, and I apply it.

229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

■■■ If the defendants make a prima facie showing of both discriminatory effect and purpose, the burden shifts to the government to show the same enforcement decision would have been made even if race had not been considered. *Bell*, 86 F.3d at 823 (citing *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 819 n. 2 (4th Cir.1995)).

■■■ While a prima facie equal protection claim may be proved by direct evidence of racial discrimination, (*Johnson*, 326 F.3d at 1000), it is more commonly based on circumstantial evidence. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir.1997)(there will seldom be 'eyewitness' testimony concerning racially discriminatory mental processes). An officer's discriminatory selective law enforcement may be inferred from evidence of the officer's pattern and method of performing traffic stops and arrests; relevant departmental policies and training governing the officer's conduct; failure to uniformly comply with the relevant training and supervisory instruction received; the questions presented and statements made by the officer to vehicle occupants; the specific events of the traffic stop at issue; and any other relevant information which may support an inference of discriminatory purpose in this context. *Marshall*, 345 F.3d at 1168; *United States v. Woods*, 213 F.3d 1021, 1022–23 (8th Cir.2000)(discussing Minnesota's policy and task force report on racial profiling). To the extent they are reliable, statistics may be used to evaluate whether the officer's "pattern" of traffic stops and arrests raises an inference of racial discrimination or tends to prove that similarly situated members of non-minority groups were treated better. *Marshall*, 345 F.3d at 1171. While statistics alone will rarely be sufficient to prove racially discriminatory conduct, personal accounts of actual

discrimination or the effects of discriminatory practices may complement this empirical evidence and bring "cold numbers convincingly to life." *International Broth. of Teamsters v. U.S.*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)(evaluating sufficiency of evidence in a Title VII racial discrimination action). See also, *Catlett v. Missouri Highway and Transp. Com'n*, 828 F.2d 1260, 1265 (8th Cir.1987)(statistical evidence revealing gender disparity in hiring and anecdotal evidence of discriminatory acts may establish pattern or practice of discrimination); *Coral Constr. Co. v. King County*, 941 F.2d 910, 919 (9th Cir.1991)("[T]he combination of convincing anecdotal and statistical evidence is potent.").

■■■ The defendants argue they have established that, when considered in the context of NSP's policies and training, Trooper Pelster's education, experience, his historical pattern and method of conducting traffic stops, and the personal accounts of traffic stops as related by the defendants and other minority motorists, it is apparent that the December 4, 2002 traffic stop arose from unlawful and race-based selective enforcement. They claim the evidence, when considered in the totality, evinces Trooper Pelster's discriminatory purpose and the discriminatory effect of the traffic stop.

While a law enforcement agency may, through its training, policies, and supervision of troopers unlawfully promote racial profiling as a means of law enforcement, (*Chavez*, 251 F.3d at 646–7), there is no evidence that NSP explicitly or implicitly encouraged the use of racial profiling in its traffic enforcement or criminal interdiction efforts. To the contrary, the NSP criminal interdiction training manual used for instructing NSP road patrol officers and the testimony of Trooper Pelster and NSP criminal interdiction trainer, Trooper

Gregory Goltz, reveal that NSP officers are specifically taught to not consider race in determining which vehicles to stop and which drivers to suspect of criminal activity.

The troopers, including Trooper Pelster, were trained that people of all races and ethnic backgrounds commit drug-related crimes, and therefore focusing criminal interdiction efforts on the basis of race is counter-productive and unduly narrows the officer's focus in detecting criminal activity. The policies and directives of NSP, including any authored by Colonel Tom Nesbitt, did not endorse racial profiling or any other unlawful conduct as an acceptable means of law enforcement. The defendants' evidence of NSP policies or the NSP training Trooper Pelster received does not support their claim of discriminatory law enforcement. *Chavez*, 251 F.3d at 646–7 (though an Illinois State Police document referenced the high number of Hispanics involved in drug trade, where its policy did not endorse racial profiling and its training stated that people of every race and ethnicity may be involved in crime and "to focus on a single segment of society is to limit your enforcement opportunities," such evidence did not support a finding of selective enforcement in violation of the Equal Protection Clause). See also, *United States v. Woods*, 213 F.3d 1021, 1022–23 (8th Cir.2000)(finding by Minnesota Task Force that "race is equated with the likelihood of ongoing criminal activity in the minds of many police officers" does not come "close to establishing that the officers' decision to approach [defendant] was motivated by race"); *Farm Labor Organizing Comm.*, 308 F.3d 523, 534 n. 4(noting that although proving a similarly situated class was not investigated is unnecessary if the law enforcement policy contains an express, racial classification, the record contained no indication that the Ohio State Highway Patrol employed explicit racial criteria or admitted to racially-motivated decision making).

The evidence clearly establishes that Trooper Pelster focused his patrol efforts on Interstate 80 travelers, almost to the complete exclusion of patrolling any other locations within his assigned territory. Trooper Pelster was interested in criminal drug interdiction and believed the Interstate 80 traffic was the most likely source of highway drug trafficking in Nebraska. While his success at drug interdiction was lauded in his performance reviews, Trooper Pelster's supervisors nonetheless repeatedly suggested [36] that he police his entire assigned territory. Disregarding these comments, Trooper Pelster continued to focus almost exclusively on Interstate 80, because he believed he was most skilled in drug interdiction (an assessment shared by his supervisors) and could best serve Nebraska by continuously using that skill. The defendants argue this conduct proves Trooper Pelster had a practice and habit of disobeying or ignoring instruction which, in turn, supports their claim that Trooper Pelster engaged in racial profiling, notwithstanding NSP training and instruction to the contrary.

Trooper Pelster was never disciplined for refusing to patrol his entire territory, and his performance reviews indicated at least satisfactory performance in all areas. In fact, his supervisory evaluations praised his Interstate 80 drug interdiction successes and acknowledged the quality of his work in that area. There was no evidence presented that Trooper Pelster's supervisors actually ordered the trooper to patrol his practices.

---

**36.** "Suggest" is all they did; there is no evidence that he was ever "ordered" to change

his entire territory when such an order would serve to sacrifice Trooper Pelster's drug interdiction efforts on Interstate 80. Since the evidence does not convincingly establish that Trooper Pelster failed to obey a direct supervisory order, it cannot serve to prove a habit of general insubordination.

More importantly, despite the efforts of counsel to depict Trooper Pelster as an officer who refused to comply with authority, any connection between his alleged disobedience in patrolling Interstate 80 and his alleged racial profiling is too tenuous to be relevant. Based on the facts presented, even if Trooper Pelster violated a supervisory order by patrolling Interstate 80 to the exclusion of the remainder of his assigned territory, this fact does not tend to prove the allegation at issue in this case— that he disobeyed NSP policies and training by stopping vehicle based on race. See e.g., *United States v. Elliott*, 89 F.3d 1360, 1369 (8th Cir.1996)(in trial alleging defendant defrauded the state by knowingly submitting false bills, testimony of state's poor practices in categorizing files or paying for work on closed files was irrelevant).

The December 4, 2002 traffic stop occurred as the defendants were traveling eastbound on Interstate 80 near Grand Island. The defendants believe they were stopped because they are black. Trooper Pelster is white. The defendants claim Trooper Pelster drove into the passing lane and alongside their vehicle, saw they were black, passed their vehicle, slowed his patrol car and required the defendants to pass him, and then initiated the traffic stop. They claim no traffic violation occurred and that even if it did, Trooper Pelster would not have stopped a white person for improper passing and careless driving under the circumstances presented. They argue that Trooper Pelster's

admitted practice of "de-policing" proves he takes race into account when choosing which violators to stop in an attempt to manipulate the state-mandated statistical reporting of his minority traffic stops.

Trooper Pelster explained that to avoid the perception of racism, he occasionally "de-polices" by choosing to stop white motorists while ignoring minority violators. Under this practice, he considers race in deciding who to stop, or more accurately, who not to stop. However, defendants failed to show a nexus between this offensive practice and the particular stop at issue. Trooper Pelster testified that he maintained no formal or informal tally of his minority traffic stops, and employed the practice as to minority drivers about once a month, and for other reasons, daily.[37] The credibility of these statements is substantiated by the fact that Trooper Pelster erroneously and significantly overestimated the ratio of his minority traffic stops upon questioning by supervisors, and even with his de-policing efforts, he maintained a high percent of minority stops compared to Troop C statistics.

The defendants have successfully proved that Trooper Pelster is not "color-blind" when conducting traffic stops, but they have not shown that his de-policing practice had any bearing on whether their vehicle was stopped. Trooper Pelster worked the evening shift from 5:00 p.m. to 3:00 a.m. and, particularly in December, most of his road patrol time was spent in darkness. See T2, exhibit 233B. As such, unless he was patrolling in areas particularly well lighted during nighttime hours, any efforts he made to stop more white motorists would likely occur in the daytime when he could readily see the driver's race or skin color. See *United States v. Stanley*, 2003 WL 22327177, *7 (D.Kan. 2003)(claim of traffic stop based on race

---

**37.** T2, 1004. No other witness testified that any other troopers engage in de-policing.

requires showing the officer could see the defendant's race or skin color before stopping him). The defendants' traffic stop occurred in the daytime. Therefore, any "de-policing" by Trooper Pelster should have made it less, not more likely that defendants' vehicle would be stopped.

But not necessarily. A race-conscious trooper could establish for himself or herself a "threshold" number of stops of white drivers which, when completed, might then serve to "justify" stopping targeted non-white drivers. There was no direct evidence of Trooper Pelster engaging in such a practice, however, and his statistics are not so one-sided as to readily show such a pattern. See, Exhibit 233B at pp. 21–22 (Traffic stops of December 2 through December 4, 2002).

■ Race-based traffic stops are unlawful. Period. Stopping some "threshold" number of white motorists does not permit occasional mistreatment of non-white motorists. To hold otherwise would make a mockery of the protections of the Equal Protection Clause. *Chavez*, 251 F.3d at 637. However, the law places the burden of proving an officer's racial animus on defendants challenging a traffic stop as racially motivated.

> Police officers and departments should not lightly be put to the expense and risk of trial on charges of racial discrimination that may be easy to make and difficult to disprove.[38] Not only does litigation divert prosecutorial resources and threaten an excessive judicial interference with executive discretion, ... it could induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws. For example, police may be induced to direct their law enforcement efforts in race-conscious ways by focusing law enforcement on neighborhoods with relatively few low-income, minority persons. Perhaps for these reasons, the Supreme Court has held that "to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present "clear evidence to the contrary." ... Claims of racially discriminatory traffic stops and arrests should be held to a similarly high standard."

*Marshall*, 345 F.3d at 1167 (quoting *Armstrong*, 517 U.S. at 465, 116 S.Ct. 1480.) Trooper Pelster's de-policing practice is selective enforcement based on race, he should be, if he hasn't already been, ordered to cease and desist from its use. In this case, however, the defendants have failed to prove a sufficient link between the practice and the December 4, 2002 vehicle stop.

Trooper Pelster's admission to "de-policing" requires that all of his practices be viewed with suspicion, and I have done so. The evidence establishes that defendant Hare improperly cut in front of a passing Suburban when he moved his vehicle into the interstate passing lane, and both the testimony and the traffic stop videotape prove that after passing Trooper Pelster's vehicle, the defendants returned to the driving lane carelessly close to the front of the trooper's patrol car. Although Trooper Pelster knew the defendants were black when he initiated the traffic stop, the defendants have not proved a similarly situated white motorist would not have been stopped for the combination of violations Trooper Pelster witnessed, especially when the second violation involved closely cutting back directly in front of the patrol vehicle. I am convinced that any driver who cuts off a trooper in this fashion would be stopped; I therefore must conclude that the defendants have failed to prove

---

**38.** As shown by this case, they are also exceedingly difficult to prove.

Trooper Pelster's discriminatory purpose in conducting this stop.[39] See, *Bell,* 86 F.3d 820 (8th Cir.1996) (although black bicyclist stopped for lack of headlamp proved only blacks were cited for this violation, he failed to prove white bicyclists also violated the statute and police chose not to arrest them); *Barlow,* 310 F.3d at 1012 (even assuming statistics proved minorities were disproportionately stopped, defendant must prove he received less favorable treatment than similarly situated white travelers by presenting evidence that DEA agents observed whites engaging in the same behavior but chose not to approach them). The facts related to the December 4, 2002 traffic stop, along with the defendants' subjective belief that the stop was racially motivated, do not, in and of themselves, establish prima facie evidence that Trooper Pelster initiated this traffic stop either partially or primarily on the basis of race. *Johnson,* 326 F.3d at 1000 (in § 1983 action, plaintiff's statement that she committed no traffic violation and was stopped on account of her race, combined with her claim that the officer was in a position to see her race, followed her for eleven miles before initiating the stop, and contacted her husband's military employer the next day to call the stop to its attention, was insufficient to present case of racial animus). See also, *Avalos v. City of Glenwood,* 269 F.Supp.2d 1091, 1116 (S.D.Ia.2003) (in § 1983 case, although plaintiffs had numerous encounters with the police, and believed they were stopped and investigated because of their race, this evidence combined with variance in race between plaintiffs and officers provided no evidence of discriminatory motive).

■ Trooper Pelster's language and behavior during the traffic stop likewise do not support defendants' claim of selective enforcement. Racially derogatory language or conversation, and racially motivated behavior during the traffic stop is strong evidence of an officer's racial animus. *Chavez,* 251 F.3d at 646 (citing *DeWalt v. Carter,* 224 F.3d 607, 612 n. 3 (7th Cir.2000) and *Bell v. City of Milwaukee,* 746 F.2d 1205, 1259 (7th Cir.1984)). See also *Barlow,* 310 F.3d 1007, 1012 (7th Cir. 2002) (no evidence of racial profiling where agents made no racial comments during the encounter and there is no evidence of a DEA policy, either actual or de facto, encouraging racial profiling). However, the videotape of this traffic stop establishes that Trooper Pelster was professional when addressing the defendants, and there were no racial overtones in his speech or conduct during this stop. The events of the traffic stop unfolded, quite literally, "by the book;" specifically, the NSP criminal interdiction training manual (exhibit T2, 230).

Based on the information Trooper Pelster obtained during the traffic stop, he was reasonable in suspecting that defendants were engaged in criminal behavior. He requested consent to search their vehicle and when the response to that request was ambiguous, he presumed the answer was "no" and requested canine assistance before conducting any search. Trooper Pelster's conduct after the actual stopping of defendants' vehicle, which was consistent with his NSP training and the methods he employs during every traffic stop irrespective of the motorist's race, is not evidence of unlawful selective enforcement.

The defendants claim that while the NSP policies and training, and the traffic stop itself may appear racially neutral on

---

**39.** More troubling is the gnawing question of whether, had the second violation *not* occurred, Trooper Pelster would have stopped a white motorist whose one, similar violation he witnessed only in his rear-view mirror. Since this is not what happened, I do not address it except to observe that only Trooper Pelster can know its answer.

the surface, Trooper Pelster's statistics paint an entirely different picture that belies any finding of racial neutrality. They claim the statistical evidence proves Trooper Pelster stops a substantially disproportionate number of minorities, stops minorities for traffic violations not similarly enforced against whites, and requests consent to search or detains the motorists awaiting canine assistance in a disproportionately high number of minority traffic stops.

■■■ Purely statistical evidence may be helpful, but is rarely sufficient alone to support an equal protection claim. *McCleskey v. Kemp,* 481 U.S. 279, 293 n. 12, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Further, although statistics in a case may imply a policy of selective enforcement, absent proof that the selection was deliberately based upon an unjustifiable standard such as race, there is insufficient evidentiary support for finding a denial of equal protection. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962).

■■■ A defendant cannot prove discriminatory purpose or effect based solely on statistical evidence which indicates the officer stops a disproportionate number of minorities. "Absent some evidence of racially disproportionate arrests compared to the actual incidence of violations by race, there is no basis for inferring racially selective law enforcement." *Bell,* 86 F.3d at 823 (quoting *Swint v. City of Wadley, Ala.,* 51 F.3d 988, 1000 (11th Cir.1995)). The validity of any conclusions based on comparing between the number of minority motorists stopped with their percentage in the relevant population depends on reliably measuring the demographics of the relevant traveling population, determining whether the data represents similarly situated individuals, and assessing the actual incidence of crime among different racial or ethnic segments of the population. *Marshall,* 345 F.3d at 1168 (citing *Arm-*

*strong,* 517 U.S. at 469–70, 116 S.Ct. 1480 and *Chavez,* 251 F.3d at 626). "The statistics proffered must address the crucial question of whether one class is being treated differently from another class that is otherwise similarly situated." *Chavez,* 251 F.3d at 638 (citing *Schweiker v. Wilson,* 450 U.S. 221, 233, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981)).

■■■ The defendants argue that Trooper Pelster's traffic stop data proves the percent of his minority stops significantly exceeds the percent of minorities reported in census data for Hamilton County, Nebraska, the State of Nebraska, or the United States. However, census data were not shown to be a reliable comparator to the racial demographics of motorists on Nebraska's Interstate 80 within Trooper Pelster's assigned territory. See *Chavez,* 251 F.3d at 644 (Census data is not reliable for determining the number of Hispanics and African–Americans driving on Illinois interstate highways). For example, using census data would require assuming that all who are reported in the census drive vehicles, and all such drivers use the portion of the interstate patrolled by Trooper Pelster. These assumptions were not shown to be accurate and therefore cannot be used as a point of comparison to conclude that Trooper Pelster stops vehicles based on race. *Chavez,* 251 F.3d at 644–45.

■■■ The defendants have also compared Trooper Pelster's traffic stop data to overall averages for every NSP Troop in Nebraska, including Troop C. Thirty percent of Trooper Pelster's stops are of minorities, while the overall minority stops for Troop C is ten percent. This disparity, however, does not necessarily show Trooper Pelster's discriminatory animus, for several reasons. First, troopers in Troop C are assigned to patrol different geographic areas. Troop C encompasses seventeen

counties and the interstate passes through only four of those counties (Buffalo, Hall, Hamilton, and York—T2, 1020 and exhibit 201). The overall statistics for Troop C include traffic stops made in thirteen rural counties that have no interstate traffic and on roadways other than the interstate in the four counties it traverses. The evidence is that this is not the population of drivers where Trooper Pelster patrols. This data therefore cannot provide a reliable baseline for comparison of Trooper Pelster's traffic stops.

Trooper Pelster's March 2003 Supervisory Observation Form states that, for the six previous months (which includes the date of defendants' traffic stop), 98.5% of Trooper Pelster's traffic stops were of motorists traveling Interstate 80. Particularly under these circumstances, a reliable assessment of Trooper Pelster's traffic stops begins with knowing the racial demographics of the motorists actually traveling on Interstate 80. It further requires information concerning the actual incidence of traffic violations among the traveling racial or ethnic populations. No evidence was offered concerning either of these comparative criteria. Therefore, the evidence does not provide a basis to reliably assess whether Trooper Pelster stopped a disproportionate number of minority drivers, or a racially disproportionate percent of those committing traffic violations, while performing his road patrol duties.[40]

■ The defendants claim that Trooper Pelster engages in racial profiling by stopping vehicles for improper passing and careless driving offenses not enforced against whites, asks a disproportionate number of minorities to consent to a vehicle search, and detains a significantly higher ratio of minorities while awaiting canine assistance. Of Trooper Pelster's 1636 traffic stops occurring between July 1, 2001 and May 31, 2003, sixty-five were for improper passing or careless driving, consent to search was requested only eighty-nine times, and a canine was used only forty-three times. Although the defendants offered expert testimony to explain statistical evidence in this case, there was no testimony to explain whether computation made from these small subsets of the total traffic stop data can provide reliable statistical evidence. See *Chavez*, 251 F.3d at

---

40. Determining the appropriate "similarly situated population" for equal protection comparison in this context is a "slippery slope," and may, in fact, make the *Armstrong* burden placed on defendants impossible to meet. For example, if the defendants prove a disparity between a trooper's stops and the traveling population on I-80, the government could contend that the comparator should be the traveling population on a particular stretch of I-80. If the defendants prove a disparity between the trooper's stops and the traveling population on that stretch of I-80, the government could argue that the similarly situated population is only those travelers on I-80 on a particular day of the week. As defendants adduce evidence of one comparator group, the government contends it is too broad, so on *ad infinitum* until the group is so narrowly defined (e.g., the eastbound, non-truck, traveling population on a particular stretch of I-80 on non-holiday, September Mondays between 3:00 and 5:00 p.m. that commit improper lane changes without signaling) that even if it is "similarly situated," the number of travelers in it is either too ridiculous or too small for statistical analysis. See, *Armstrong* 517 U.S. at 466, 470, 116 S.Ct. 1480. In this case, however, there were no statistics of any comparator group, reasonable or not, suggested by the defendants' evidence, making this a moot point.

On the other hand, no single "renegade" law enforcement officer should be permitted to run roughshod over the rights of minorities simply because he is the only one in his class, and his statistics can't be nicely compared to those of other officers. I have viewed Trooper Pelster's statistics with the suspicion his admissions and statistics generated, and I conclude that the empirical evidence in this record is simply not strong enough to show him to be such a "renegade."

643 (statistics prove nothing when it is impossible to tell if this sample size is sufficiently large to be reliable) (citing *Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 995 (7th Cir.1983) (noting that "[c]ourts in Title VII actions have almost uniformly rejected statistical conclusions based upon such small samples")).

Further, considered in the context of all traffic stops, approximately 6.5 percent of Trooper Pelster's stops of minority drivers were for improper passing or careless driving compared to over 3.5 percent of such stops of white drivers. Given the small subset of data at issue, the lack of any specific information related to these traffic stops, and the lack of data identifying the expected rate of careless driving or improper passing violations by race, the statistical evidence is insufficiently reliable to prove that Trooper Pelster fails to stop similarly situated white drivers committing careless driving or improper passing offenses.

Consent was requested from minority drivers in less than ten percent of Trooper Pelster's minority traffic stops compared to approximately four percent of traffic stops involving white drivers. Trooper Pelster does not request consent to search a vehicle absent indicia of criminal conduct. Since his criminal interdiction efforts focused on drug-related crimes on Interstate 80, the relative rate by race of highway drug trafficking offenses committed may or may not explain any disparity in requesting consent to search the vehicle, but the defendants have offered no evidence on this issue.

*Armstrong* held that courts cannot assess statistical evidence by presuming "that people of all races commit all types of crimes" in equal proportions.[41] *Armstrong*, 517 U.S. at 469, 116 S.Ct. 1480. Assuming that the existence of reasonable suspicion correlates with the likelihood of actual criminal activity, any statistical interpretation of Trooper Pelster's requests for consent would seemingly require a comparison with the relative rate of minority drug trafficking crimes. This evidence is not in the record.

In every one of the eighty-nine cases where Trooper Pelster requested consent, he always requested a canine when consent was denied. See T2, exhibit 4. The defendants claim a canine was called to the traffic scene at a substantially higher rate for minority traffic stops. However, a significantly higher percent of minority drivers denied consent. While the raw statistics reflect a distinct disparity in the percent of cases where canine assistance was requested in minority traffic stops, the data also reflects that once consent was denied, minority and non-minority drivers were treated the same. The evidence does not support a claim that Trooper Pelster treated similarly situated white persons differently when calling for canine assistance.

"[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Chavez*, 251 F.3d at 638 (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Under the circumstances presented by the evidence in this case, the statistics related to Trooper Pelster's traffic stops for improper passing and careless

---

**41.** *Armstrong* noted that based on statistics from the United States Sentencing Commission, more than 90% of the persons sentenced in 1994 for crack cocaine trafficking were black, .. 93.4% of convicted LSD dealers were white, ..., and 91% of those convicted for pornography or prostitution were white ... "Presumptions at war with presumably reliable statistics have no proper place in the analysis of this issue."

driving, and his requests for consent to search and canine assistance, when viewed in the context of all his traffic stops and his consistent method of conducting a traffic stop, do not support defendants' claim of racial profiling.

 The remaining evidence offered by defendants is anecdotal evidence offered by three minority motorists who believe they were stopped and, in the case of Mr. Wimberly, harassed because of their race. This evidence was disturbing and underscores the justification for the statistical record keeping burdens placed on NSP by the Nebraska Legislature. Nevertheless, the probative value of the testimony offered by Mr. Long, Mr. Villegran, and Mr. Wimberly, was seriously undermined in cross-examination and, in any event, must be considered with the totality of defendants' evidence. I conclude that the events of defendants' traffic stop, when considered in the context of Trooper Pelster's training and method of performing road patrol duties, NSP policies and instruction, and the statistical evidence offered, does not prove the December 4, 2002 traffic stop was initiated for a discriminatory purpose or had a discriminatory effect. The anecdotal evidence of three dissimilar traffic stops does not alter that conclusion. See *Armstrong*, 517 U.S. at 470, 116 S.Ct. 1480 (where statistical study did not constitute evidence of selective prosecution, reported personal conclusions of racial bias based on anecdotal evidence were not sufficient to present a claim).

In summary, the defendants presented insufficient evidence to prove they were singled out and stopped on December 4, 2002 because of their race. They failed to prove that similarly situated whites were not stopped by Trooper Pelster for the offenses of the improper passing and careless driving, or that Trooper Pelster chooses to stop minorities generally, or for improper passing or careless driving offenses specifically, because of their race. The defendants failed to prove that Trooper Pelster requested consent to search their vehicle and used a canine at the scene on December 4, 2002 because of their race, and they failed to prove that once Trooper Pelster conducts traffic stops, he has a pattern or practice of requesting consent to search the vehicle and call for canine assistance on the basis of race. The defendants failed to prove the December 4, 2002 stop arose from a racially discriminatory purpose or that Trooper Pelster's enforcement of traffic laws had a discriminatory effect against minority drivers. The defendants have failed to establish an equal protection claim based upon selective enforcement.

*Unlawful Selective Enforcement: The Right to Travel* [42]

 The defendants claim their right to travel was violated because Trooper Pelster stopped their vehicle for having California license plates. The constitutional right to travel provides that, in the absence of a compelling state interest, the defendants had the right to enter and leave Nebraska, and the right to be treated as welcome visitors rather than as unfriendly trespassers when temporarily present in Nebraska. *Minnesota Senior Federation, Metropolitan Region v. Unit-*

---

**42.** "The right to travel and to move from one state to another has long been accepted, yet both the nature and the source of that right have remained obscure." *Zobel v. Williams*, 457 U.S. 55, 61 n. 6, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (citing *Jones v. Helms*, 452 U.S. 412, 418–419 nn. 12 & 13, 101 S.Ct.

2434, 69 L.Ed.2d 118 (1981); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), rev'd on other grounds, *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *United States v. Guest*, 383 U.S. 745, 757–759, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966)).

*ed States*, 273 F.3d 805, 809 (8th Cir.2001). The constitutional right to travel "protects interstate travelers against two sets of burdens: 'the erection of actual barriers to interstate movement' and 'being treated differently' from intrastate travelers." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 277, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993) (citing *Zobel v. Williams*, 457 U.S. 55, 60, n. 6, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982)). A "right to travel analysis refers to little more than a particular application of equal protection analysis." *Zobel*, 457 U.S. at 61 n. 6, 102 S.Ct. 2309. Any classification which serves to penalize citizens of other states violates the right to travel unless the classification is shown to be necessary to promote a compelling governmental interest. *Id.* (citing *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)).

Governmental restrictions on the right to travel must be weighed against the necessity advanced to justify them, and a restriction that burdens the right to travel "too broadly and indiscriminately" cannot be sustained. *Aptheker v. Secretary of State*, 378 U.S. 500, 505, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). As applied to this case, the goal of Trooper Pelster's practice of "keying on" California vehicles is to stop the flow of drugs through Nebraska. "The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit." *United States v. Place*, 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (quoting *United States v. Mendenhall*, 446 U.S. 544, 561, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Powell, J. concurring)). "Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs ... may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement." *Place*, 462 U.S. at 704 n. 5, 103 S.Ct. 2637 (quoting *United States v. Mendenhall*, 446 U.S. at 561–562, 100 S.Ct. 1870 (Powell, J., concurring)).

The defendants claim that despite this compelling interest, their right to travel through Nebraska was unconstitutionally burdened by Trooper Pelster's practice of paying closer attention to California vehicles traveling eastbound through the state; enforcing traffic laws against California vehicles that are not enforced against Nebraska vehicles; and, upon seeing both an out-of-state and Nebraska vehicle simultaneously committing a violation, preferring to stop the out-of-state vehicle because of its license plates.

The defendants claim Trooper Pelster violated their right to travel by focusing on their vehicle and deciding to stop it because it had California license plates. Trooper Pelster admits that while performing road patrol on Interstate 80, he "keys on" or shows particular interest in vehicles with out-of-state license plates, and particularly California plates. He adopted this practice because he was taught and his personal experience has reenforced that Interstate 80 in Nebraska has developed into a busy corridor for substantial eastbound drug trafficking from cities and locations in California.

A police officer's enforcement of a valid traffic law does not violate the motorist's right to travel. The constitutional right to travel through Nebraska is not a right to travel in any manner one wants, free of state regulation, and it does not give defendants the right to ignore Nebraska's traffic laws at their discretion. *West v. Duncan*, 179 F.Supp.2d 794, 803 n. 5 (N.D.Ohio 2001); *U.S. ex rel. Verdone v. Circuit Court for Taylor County*, 851 F.Supp. 345, 350 (W.D.Wis.1993).

It is important to note at the outset Trooper Pelster's testimony that he does not stop California vehicles absent a traffic infraction. Even if an officer focus-

es on out-of-state plates, the existence of a traffic violation justifies a traffic stop without violating the driver's right to travel. *United States v. Walraven,* 892 F.2d 972 (10th Cir.1989) (no right to travel violation where trooper engaged in practice of calling in plates of out-of-state but not in-state vehicles, was erroneously told California vehicles plates did not match vehicle description, and vehicle stop was incorrectly initiated for invalid plates).

Trooper Pelster stopped the defendants' vehicle for two violations of Nebraska's traffic laws. Based on Trooper Pelster's credible testimony, and a review of the videotape, I conclude it is unlikely a Nebraska vehicle would not likewise have been stopped under these circumstances, and the defendants have offered no evidence to the contrary. There is no credible evidence that Trooper Pelster observed both a Nebraska vehicle and defendants' vehicle committing a traffic violation at or near the same time and, based on the plates, chose to stop the defendants' vehicle. The traffic stop of defendant's vehicle was not initiated for any discriminatory purpose related to out-of-state license plates.

There is also no evidence that Trooper Pelster's practice of focusing on California vehicles created an "actual barrier" or burden on California Interstate 80 travelers. *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 277, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993); *Chavez,* 251 F.3d at 649; *Md. State Conference of NAACP Branches v. Md. Dept. of State Police,* 72 F.Supp.2d 560, 568 (D.Md.1999). No reliable statistical evidence was received concerning the ratio of in-state versus out-of-state vehicles traveling on Nebraska's Interstate 80, committing traffic violations, or stopped by Trooper Pelster. Seventy-five percent of Trooper Pelster's traffic stops result in a warning ticket and, therefore, the NSP database does not include the license plate data for seventy-five percent of this trooper's stops.

The defendants failed to prove that their vehicle was stopped because of its California plates, that the presence of California plates was a factor in choosing to stop their vehicle, or that Trooper Pelster's practice of "keying on" California vehicles has broadly and indiscriminately burdened their right or the right of California motorists to travel through Nebraska. The defendants have failed to prove the December 4, 2002 traffic stop for violating Nebraska's traffic laws violated their constitutional right to travel.[43]

**43.** The parties were asked to brief the question of available remedies assuming the defendants could prove selective enforcement in violation of the Equal Protection Clause or the constitutional right to travel. Having concluded they failed to prove these constitutional violations, I need not address whether dismissal or suppression of evidence in a criminal case is an available remedy for these violations. I nonetheless note that there is no Supreme Court case law endorsing the judicially created sanction of suppressing evidence for violating a criminal suspect's rights to equal protection or the right to travel. The Supreme Court has noted:

> We have never determined whether dismissal of the indictment, or some other sanction, is the proper remedy if a court

determines that a defendant has been the victim of prosecution on the basis of his race.

*Armstrong,* 517 U.S. at 461 n. 2, 116 S.Ct. 1480. (remedy of dismissal was offered by the prosecutors and therefore not discussed by the court).

*United States v. Laymon,* 730 F.Supp. 332, 339–40 suppressed evidence obtained in violation of defendant's rights under the Fourth Amendment, Equal Protection Clause, and his right to travel. *Laymon* contains no analysis of whether suppression would be appropriate absent a Fourth Amendment violation. The New Jersey Supreme Court has held that evidence may be suppressed for violations of the Equal Protection Clause. *State v. Segars,* 172 N.J. 481, 799 A.2d 541 (2002) ("once it has been established that selective enforce-

Because of the lengthy hearing and lengthy record, together with extended periods of time granted counsel for post-hearing briefs and the correction of the transcript, I also conclude that this case is sufficiently "unusual or complex" within the meaning of 18 U.S.C. § 3161(h)(8)(A) and (B)(ii) that it is unreasonable to expect adequate pretrial preparation within the time limits of the Speedy Trial Act. I shall, therefore, exclude it from those limits.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that the defendants' Motions to Suppress and/or to Dismiss, filings 49, 51, and 53, be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

FURTHER, IT HEREBY IS ORDERED:

1. The defendants are given twenty days from this date in which to file their objections to this report and recommendation.

2. Trial of this matter will be scheduled after the assigned district judge has acted upon this recommendation.

Feb. 23, 2004.

---

ment has occurred" the fruits thereof "will be suppressed" in the interest of "deterrence of impermissible investigatory behavior and maintenance of the integrity of the judicial system"); *State v. Soto,* 324 N.J.Super. 66, 734 A.2d 350 (1996) (evidence suppressed because statistical evidence established "an officially sanctioned or de facto policy of targeting minorities for investigation and arrest"). See also, *United States v. Pollard,* 209 F.Supp.2d 525 (D.Vi.2002), rev'd on other grounds, 326 F.3d 397 (3d Cir.2003) (suppression of evidence obtained in contravention of defendant's equal protection rights would be viable remedy, since remedy would fully comport with objective of the exclusionary rule as judicially created remedy de-

signed to safeguard rights generally), and *United States v. Navarro–Camacho,* 186 F.3d 701, 711 (6th Cir.1999) (Moore, J., concurring) ("In a proper case, I believe that a defendant ... could achieve suppression of the evidence or dismissal of the prosecution by demonstrating that the investigatory practice had a discriminatory purpose and a discriminatory effect").

As in this case, other courts presented with the question of whether evidence may be suppressed for violating the Equal Protection Clause have not reached the issue because the defendants failed to prove the threshold claim of unconstitutional selective enforcement. See e.g., *Chavez,* 281 F.3d at 486–87.